Matthew W. Bauer
CONNELL FOLEY LLP
85 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-0500
Attorneys for Plaintiff
Days Inns Worldwide, Inc.



JAN 03 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JUDGE MARRERO

08 CV 0027

|  |  |
|---|---|
| DAYS INNS WORLDWIDE, INC., formerly known as DAYS INNS OF AMERICA, INC., a Delaware Corporation, | : |
| Plaintiff, | : |
| v. | : |
| JBS INC., II a South Carolina Corporation; JONATHAN B. SMITH, an individual; and MARCI SINGLETON SMITH, an individual, | : |
| Defendants. | : |

Civil Action No. 07-

ECF Case

COMPLAINT

Plaintiff Days Inns Worldwide, Inc., formerly known as Days Inns of America, Inc.,
by its attorneys, Connell Foley LLP, complaining of defendants JBS Inc., II, Jonathan B. Smith and
Marci Singleton Smith says:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff Days Inns Worldwide, Inc., formerly known as Days Inns of
America, Inc. ("DIW") is a corporation organized and existing under the laws of the State of
Delaware with its principal place of business in Parsippany, New Jersey.

2.      Defendant, JBS Inc., II ("JBS"), on information and belief, is a
corporation organized and existing under the laws of the State of South Carolina, with its

principal place of business at 2103 North Ocean Boulevard, Myrtle Beach, South Carolina, 29577.

3.     Defendant, Jonathan B. Smith ("Jonathan"), on information and belief, is a principal of JBS and a citizen of the State of South Carolina, residing at 2103 North Ocean Boulevard, Myrtle Beach, South Carolina, 29577.

4.     Defendant, Marci Singleton Smith ("Marci"), on information and belief, is a principal of JBS and a citizen of the State of South Carolina, residing at 2103 North Ocean Boulevard, Myrtle Beach, South Carolina, 29577.

5.     The amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

7.     This Court has personal jurisdiction over JBS by virtue of, among other things, section 23(f) of the January 5, 1993 License Agreement by and between JBS and DIW (the "License Agreement"), described in more detail below, pursuant to which JBS has consented "to the non-exclusive personal jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York . . . ."

8.     This Court has personal jurisdiction over Jonathan and Marci by virtue of, among other things, the terms of a Guaranty (the "Guaranty"), described in more detail below, pursuant to which Jonathan and Marci consented to the non-exclusive personal jurisdiction of the

courts of the State of New York and the United States District Court for the Southern District of New York . . . ."

9.    Venue is proper in this District pursuant to section 23(f) of the License Agreement, inasmuch as that provision contains an express waiver by JBS of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Days Marks

10.    DIW is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

11.    DIW has the exclusive right to sublicense the use of various trade names and service marks (which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Days Marks"), as well as the distinctive Days Inns® System, which provides hotel services to the public under the Days name and certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services.

12.    DIW or its predecessors have continuously used each of the Days Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. § 1065.

13.    DIW has given notice to the public of the registration of the Days Marks as provided in 15 U.S.C. § 1111.

1886542-01
06230/074833

14.    DIW uses or has used the words "Days Inn," among others, as abbreviations of its brand name.

15.    Through its franchise system, DIW markets, promotes, and provides services to its guest lodging franchisees throughout the United States. In order to identify the origin of their guest lodging services, DIW allows its franchisees to utilize the Days Marks and to promote the Days Inn brand name.

16.    DIW has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Days Marks as distinctly designating DIW guest lodging services as originating with DIW.

17.    The value of the goodwill developed in the Days Marks does not admit of precise monetary calculation, but because DIW is one of the largest guest lodging facility franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of DIW's goodwill exceeds hundreds of millions of dollars.

18.    The Days Marks are indisputably among the most famous in the United States.

<u>The Agreements Between The Parties</u>

19.    DIW entered into the License Agreement with JBS for the operation of a 79-room guest lodging facility located at 2104 North Ocean Boulevard, Myrtle Beach, South Carolina, 29577, Site No. 04730-13760-1 (the "Facility"). A true copy of the License

Agreement is attached hereto as Exhibit A. On August 5, 1999, JBS entered into an amendment of the License Agreement to increase the number of approved guest rooms from 79 to 120.

20.    Pursuant to section 6 of the License Agreement, JBS was obligated to operate a Days Inn® guest lodging facility for a 10-year term, during which time JBS was permitted to use the Days Marks in association with the operation and use of the Facility as part of DIW's franchise system.

21.    Pursuant to section 8 and Schedule C of the License Agreement, JBS was required to make certain periodic payments to DIW for royalties, service assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively, "Continuing Fees").

22.    Pursuant to section 16(e) of the License Agreement, JBS was required to prepare and submit monthly reports to DIW disclosing, among other things, the amount of gross room revenue earned by JBS at the Facility in the preceding month for purposes of establishing the amount of royalties and other Continuing Fees due to DIW.

23.    Pursuant to section 16(d) of the License Agreement, JBS agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 16(m) of the License Agreement, JBS agreed to allow DIW to examine, audit, and make copies of the entries in these books, records, and accounts.

24.    Pursuant to section 19(b) of the License Agreement, DIW could terminate the License Agreement, with notice to JBS, for various reasons, including JBS's (a) failure to

pay any amount due DIW under the License Agreement, (b) failure to remedy any other default of its obligations or warranties under the License Agreement within 30 days after receipt of written notice from DIW specifying one or more defaults under the License Agreement, and (c) receipt of two or more notices of default under the License Agreement in any one year period, whether or not the defaults were cured.

25.    Pursuant to section 20 of the License Agreement, JBS agreed that, in the event of a termination of the License Agreement pursuant to section 20, it would pay liquidated damages to DIW in accordance with a formula specified in the License Agreement.

26.    Section 21 of the License Agreement specified JBS's obligations in the event of a termination of the License Agreement, including its obligation to immediately cease using all of the Days Marks.

27.    Pursuant to section 23(c) of the License Agreement, JBS agreed that it would "pay all costs and expenses, including attorneys' fees, incurred by DIA in enforcing any provision of this [License] Agreement."

28.    Effective as of the date of the License Agreement, Jonathan and Marci provided DIW with a Guaranty of JBS's obligations under the License Agreement ("Guaranty"). A true copy of the Guaranty is attached hereto as Exhibit B.

29.    Pursuant to the terms of the Guaranty, Jonathan and Marci agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause to be performed each obligation of Licensee under the [License] Agreement."

30.    Pursuant to the terms of the Guaranty, Jonathan and Marci agreed to pay the costs, including reasonable attorneys' fees, incurred by DIW in enforcing its rights or remedies under the Guaranty or the License Agreement.

### The Defendants' Defaults and Termination

31.    By letter dated April 6, 2005, a true copy of which is attached hereto as Exhibit C, DIW advised JBS that (a) the License Agreement had expired and would terminated on July 6, 2005, (b) that it was required to de-identify the Facility in accordance with the post termination obligations under the License Agreement and (c) that it was responsible for payment of all Continuing Fees under the License Agreement through the date of completion of the de-identification process.

32.    More specifically, in the April 6, 2005 letter, DIW advised JBS that (a) it was to immediately discontinue the use of all trade names, service marks, signs, and other forms of advertising, and other indicia of operation as a Days Facility, and to discontinue the use of other materials on the premises effectively to distinguish the same from its former appearance as a Days System facility, (b) all items bearing the Days Marks had to be removed, (c) all signs and any listings in directories and similar guides in which the Facility was identified as a Days Inn had to be changed, and (d) demand was made for all outstanding Continuing Fees through the date of termination.

33.    The termination of the License Agreement precludes JBS from any further use of the Days Marks in or around the Facility.

34.    The termination of the License Agreement precludes JBS from any further use of the Days Marks to induce the traveling public to use the Facility in any way.

1886542-01
06230/074833

35.    Since the termination of the License Agreement, JBS continued to use the Days Marks to induce the traveling public to rent guest rooms at the Facility.

36.    Since the termination of the License Agreement, JBS has used the Days Marks without authorization to rent rooms through, among other things, failure to remove Days signage and continuing to identify the Facility as a Days guest lodging facility.

37.    By letter dated March 20, 2006, a true copy of which is attached as Exhibit D, DIW reiterated JBS's post-termination obligations under the License Agreement, including the requirement that, upon termination, JBS completely "de-identify" the Facility as a Days Inn.

38.    JBS continued to misuse the Days Marks despite receiving notification from DIW to cease and desist from the misuse of the Days Marks.

## FIRST COUNT

39.    DIW repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 38 of the Complaint.

40.    Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

1886542-01
06230/074833

41.   JBS marketed, promoted, and rented rooms at the Facility through the unauthorized use of the Days Marks, and such use caused confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

42.   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods [or] services . . . shall be liable in a civil action . . . ."

43.   The acts of JBS in marketing, promoting, and renting rooms at the Facility, through and with the Days Marks, constitute:

(a)   a false designation of origin;

(b)   a false and misleading description of fact; and

(c)   a false and misleading representation of fact;

that caused confusion, or to cause mistake, or deception, as to the affiliation of JBS's Facility with DIW, and to cause confusion, or to cause mistake, or deception, to the effect that DIW sponsors or approves of the guest lodging services that JBS provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

44.   JBS's use of the Days Marks in connection with goods and services at the Facility, after the Days Marks became famous, caused dilution and disparagement of the distinctive quality of the Days Marks, and lessened the capacity of the Days Marks to identify

1886542-01
06230/074833

and distinguish the goods and services of DIW, all in violation of Section 43(c) of the Lanham Act.

45.    JBS's acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act are malicious, fraudulent, willful, and deliberate.

46.    JBS's acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act have inflicted and continue to inflict irreparable harm on DIW.

47.    DIW has no adequate remedy at law.

48.    No previous injunctive relief has been awarded with respect to this matter in this case or any other case.

WHEREFORE, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), DIW demands judgment against Smith:

(a)    Granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

49.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 48 of the Complaint.

50.    Pursuant to sections 16(m) of the License Agreement, JBS agreed to allow DIW to examine, audit, and make copies of JBS's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

51.    JBS has engaged in acts and practices, as described, which amount to infringement of the Days Marks in an unlawful, unfair, and fraudulent manner which is likely to confuse the public.

52.    As a result, JBS owes restitution and the disgorgement of profits, in an amount unknown to DIW, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Smith.

**WHEREFORE**, DIW demands judgment ordering that JBS account to DIW for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Days Marks.

### THIRD COUNT

53.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 52 of the Complaint.

54.    Pursuant to section 8 and Schedule C of the License Agreement, JBS was obligated to remit Continuing Fees to DIW.

55.    Despite its obligation to do so, JBS failed to remit certain of the Continuing Fees due and owing under the License Agreement in the current amount of $80,260.86.

56.    JBS's failure to remit the agreed Continuing Fees constitutes a breach of the License Agreement and has damaged DIW.

1886542-01
06230/074833

- 11 -

**WHEREFORE**, DIW demands judgment against JBS for the Continuing Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

57.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 56 of the Complaint.

58.    At the time of the termination of the License Agreement, JBS was obligated to pay DIW Continuing Fees.

59.    Despite its obligation to do so, JBS failed to pay certain of the Continuing Fees due and owing under the License Agreement in the current amount of $80,260.86.

60.    In addition, JBS benefited from its wrongful use of the Days Marks after termination of the License Agreement and paid no royalty or other Continuing Fees to DIW in return for that benefit.

61.    JBS's failure to compensate DIW constitutes unjust enrichment and has damaged DIW.

**WHEREFORE**, DIW demands judgment against JBS for the Continuing Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit. and all royalties and other Continuing Fees that should be paid to compensate DIW for the period during which JBS misused the Days Marks and was thereby unjustly enriched, together with interest and costs of suit.

## FIFTH COUNT

62.    DIW repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 61 of the Complaint.

63.    Pursuant to the terms of the Guaranty, Jonathan and Marci agreed, among other things, that upon a default under the License Agreement, they would immediately make each payment and perform each obligation required of JBS under the License Agreement.

64.    Despite their obligation to do so, Jonathan and Marci have failed to make any payments or perform or cause JBS to perform each obligation required under the License Agreement.

65.    Pursuant to the Guaranty, Jonathan and Marci are liable to DIW for JBS's Continuing Fees due and owing under the License Agreement and for those additional Continuing Fees attributable to the period during which JBS has misused the Days Marks.

**WHEREFORE**, DIW demands judgment against Jonathan and Marci for damages in the amount of:

(a)    All Continuing Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit; and

(b)    All profits, royalties, and other Continuing Fees that should be paid to compensate DIW for the period during which JBS misused the Days Marks and was thereby unjustly enriched, together with interest, attorneys' fees and costs of suit.

1886542-01
06230/074833

**CONNELL FOLEY LLP**
Attorneys for Plaintiff
Days Inns Worldwide, Inc.

By: _____
        MATTHEW W. BAUER

Dated: December 28, 2007

# Exhibit A

## LICENSE AGREEMENT

This License Agreement ("Agreement"), dated _____,
19_____, is made and entered into between Days Inns of America, Inc., a
Delaware corporation ("DIA"), and JBS Inc., II, a _____ Corporation
("Licensee"). In consideration of the mutual promises, covenants and agreements
herein, the parties agree as follows:

1.    **Days Inn System.**  DIA owns the right to license, the distinctive "Days
      Inn System" operated under the "Marks" and "System Standards".  All
      quoted terms are as defined herein.

2.    **License.**  DIA grants (subject to Licensee's fulfillment of the
      "Construction Obligation" and to Licensee's compliance with all its
      other obligations hereunder, including without limitation, payment of
      all "Continuing Fees" and effective only on the "Commencement Date"), a
      limited, non-exclusive "License" to operate the "Unit" using the System,
      but only at the specified "Location" and no other, during the "Term".
      Licensee accepts the License and covenants to operate the Unit under the
      System during the Term pursuant to this Agreement.  The Unit will be
      designated and will operate under the primary name and Mark "Days Inn",
      together with a secondary designator assigned by DIA from time to time
      relating to the location and proximity to a landmark, transportation
      facility or attraction.  No other name or designation may be utilized by
      Licensee for the Unit.

3.    **The Unit.**  The "Unit" shall include the land at 21st Avenue North and
      Ocean Bld., Myrtle Beach, South Carolina  29577 (as legally described in
      Schedule "A", the "Location"), all other existing and/or replacement
      improvements, structures, furniture, fixtures and equipment (the last 3
      collectively, the "F/F/E"), appurtenances, facilities, entry/exit
      rights, parking, amenities and related rights, privileges and properties
      existing, to be constructed thereon, or subsequently added during the
      Term.

4.    **Construction Obligation.**  This Section is operative if DIA so specifies
      in Schedule B.  Licensee must commence and complete conversion and
      renovation of the Unit in accordance with the Construction Obligation
      and be ready, willing and able to open the Unit for business under the
      System by the dates specified in Schedule B.  Otherwise, in addition to
      DIA's rights under Section 19, and subject to the granting of an
      extension under Section 7, paragraph (c) below, DIA may, at its sole
      discretion, terminate this Agreement by giving written notice to
      Licensee at any time within 60 days after (i) the commencement of
      renovation or the required opening dates specified in Schedule B are
      missed, unless the Commencement Date occurs, or (ii) the Unit fails to
      achieve the required quality assurance inspection scores by the dates
      specified in Schedule B after the Commencement Date occurs.  Licensee
      will, at its expense and DIA's request, create renovation plans and

CINN192

1

specifications (based upon Schedule B and the "Design Standards") which must be submitted to DIA. Licensee will not commence renovation unless and until DIA shall have first given its written approval to such renovation plans and specifications (after approval, the "Approved Building Plans"). Such approval right is intended only to ascertain initial compliance of the submitted plans and specifications with System Standards, and not to detect errors or omissions in the work of Licensees' architects, engineers, contractors or the like. The Design Standards, Schedule B, and the Approved Building Plans, as modified with DIA's prior written approval, collectively define Licensee's "Construction Obligation". Any modifications to or variances from the Construction Obligation require DIA's prior written approval. Licensee shall promptly provide DIA with copies of such permits, job progress reports, and other information as DIA requests, and shall allow DIA to inspect renovation while in progress without prior notice. Licensee may utilize the System Standards prior to the Commencement Date only to the extent necessary to comply with the Construction Obligation. Licensee's time to commence and complete renovation may be extended in writing by DIA for a reasonable time not to exceed 60 days only because of events beyond the reasonable control of Licensee, such as strikes, materials shortages, fires and acts of God which Licensee, by the exercise of due diligence, could not have avoided.

5.    <u>Commencement Date.</u>  Operation of the Unit under the System may begin on a date (the "Opening Date") to be selected by Licensee only after DIA gives Licensee a written certificate that Licensee has completed the Unit in accordance with its Construction Obligation, and that the Unit meets, in DIA's sole discretion, all applicable System Standards. The date such certificate is issued shall be the "Commencement Date".

6.    <u>Term.</u> The License "Term" commences on the Commencement Date and (unless earlier terminated) automatically terminates on its tenth anniversary. This Agreement (as distinguished from the Term of the License) shall remain in effect from and after the date Licensee and DIA execute and deliver this Agreement through the Term and until all of Licensee's duties and obligations have been duly performed or discharged. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

7.    <u>Initial Fees</u>

    (a) <u>(Application and Initial Fees)</u>  The Application Fee paid to DIA by Licensee compensates DIA for evaluating the Application. It is not refundable unless DIA rejects the application because the Unit is too close to a System unit. The Initial Fee for the Unit is $35,000.00.

    (b) <u>(Initial Entry Charge)</u>  The Initial Entry Charge is a Reservation System Fee, payable to DIA for gaining access to the Reservation System, in an amount equal to the lesser of $100.00 per licensed guest room, or $10,000.00. This Charge is payable in three approximately equal installments due upon execution of this Agreement, and then on the first and second anniversaries of the date of this Agreement. Licensee will pay the deferred portion of the Initial Entry Charge by delivery and

CINN192



payment of a promissory note in form provided by DIA. The Initial Entry Charge for the Unit is $7,900.00.

(c) (Extension Fee)  If Licensee requests an extension of the deadline by which it is required to commence renovation of the Unit, such request shall be in writing delivered to DIA at least 15 days prior to the deadline and shall be accompanied by the payment of an "Extension Fee" equal to $100.00 multiplied by the number of days extension requested. DIA will inform Licensee in writing within 10 days after receipt of the extension request whether it will, in its sole discretion, grant the request and accept the Extension Fee, or reject the request and return the Extension Fee, less amounts then due DIA from Licensee under this Agreement or any other agreement with DIA. DIA's notice of acceptance will automatically amend this Agreement to extend such deadline to the date specified in the notice. DIA shall have no obligation to consider any extension request unless it is accompanied by payment of the proper amount of the Extension Fee.  DIA will retain the right to terminate this Agreement pursuant to Section 4 during the extension period if DIA receives a license application for a Unit to be located in the general trade territory of the Unit, in DIA's sole discretion, in which event DIA will refund to Licensee with the notice of termination the unused portion of the Extension Fee.

8.    Continuing Fees.  Royalties, assessments and interest (collectively, "Continuing Fees") shall accrue monthly and be payable to DIA in U.S. dollars as follows:

(a) (Monthly Royalties)  A "Monthly Royalty" of 6.5% of gross revenues attributable to or payable only for rentals of guest rooms at the Unit, including all credit transactions, whether or not collected ("Gross Room Revenues"), excluding charges for "Food and Beverage", key forfeitures, entertainment, telephone and room service, vending receipts, and federal, state and local sales, occupancy and use taxes, is payable monthly after the Commencement Date on the tenth day of the following month.

(b) (Reservation System User Fees)  "Reservation Fees," consisting of the charges and fees set forth on Schedule C, including without limitation a percentage of Gross Room Revenues per month, communications charges, travel agent commissions for travel agent bookings at the Unit if done through the Reservation System, "Airline Automation Charges" per reservation booked through third party computerized reservation systems, are payable monthly after the Commencement Date, as DIA directs, but not later than the tenth day of the month following the month in which billed.  DIA reserves the right to drop or change any fee described in this Paragraph (b), and to add fees for new services, at its sole discretion as to amount or formula from time to time for all Days Inn System units but with at least 30 days prior written notice, to reflect changes in its fully allocated costs of providing Reservation System-related services, and to add, drop or modify the types of reservation services it offers.

CINN192

3

(c) (Taxes) "Taxes" in an amount equal to any federal, state and local sales, gross receipts, use or similar tax assessed against or payable by DIA with respect to the Continuing Fees, if any (unless the tax is an income tax or optional alternative to an income tax otherwise payable by DIA), is payable within 10 days after receipt of DIA's invoice therefore.

(d) (Interest) "Interest" at the rate equal to the lesser of 1.5% per month or the highest rate permitted by applicable law on any past due other Continuing Fees and other monies owed DIA under this Agreement (except interest), accrued from the due date, including without limitation on amounts discovered to be due in any audit by DIA from the date such amounts should have been paid, is payable within 10 days after receipt of DIA's invoice therefor.

(e) (Minimum Annual Royalties) Licensee will pay DIA "Minimum Annual Royalties" under paragraph (a) of this Section in the amount of $15,000.00. If the Monthly Royalties paid to DIA under paragraph (a) of this Section 8 for each twelve month period ending with the month in which the anniversary of the Commencement Date occurs is less than such amount, then within 20 days after the end of each annual period, Licensee will pay DIA the difference between the aggregate Monthly Royalties paid during such period and the Minimum Annual Royalties amount. Such amount will be subject to adjustment on each March 1, beginning March 1, 1992, by multiplying the $15,000.00 factor by the "Adjustment Factor" (defined in paragraph (j) of Section 16 of this Agreement), using as the denominator of such Adjustment Factor the CPI-U for January, 1991.

(f) (Annual Conference Fee) Licensee will pay DIA an "Annual Conference Fee" annually after the execution of this Agreement and the Unit opens under the System if DIA schedules an annual franchise conference, upon receipt of an invoice from DIA, but not later than the tenth day of the month following the month in which billed. DIA will set the amount of and bill Licensee for the Fee at least 90 days before the scheduled opening date of DIA's annual franchise conference, if held by DIA or an affiliate. The Fee will be the same as the registration fee for the first conference attendee charge all licensees of DIA and its payment by Licensee will entitle one representative for the Unit to attend the annual franchise conference functions. The costs of transportation, lodging and meals (except those provided by DIA as part of the conference) for the attendee will be borne by Licensee. Licensee will be required to pay one Annual Conference Fee regardless of the number of Days Inn System units owned by Licensee.

9.   The System. The "System" means a comprehensive system for the delivery of transient lodging services which at present includes and in the future will include as DIA specifically in writing from time to time designates: the Days Inn System service marks, logos and derivations plus other logos, names, slogans, commercial symbols, trademarks and service marks (regardless of whether registered, registerable or existing at common law), System unit trade dress, and associated

business good will (collectively "Marks"); other intellectual property, including copyrights, "Confidential Information", "System Standards Manuals", and know-how; advertising, publicity and other marketing materials and programs; operating suggestions; training programs and materials and quality assurance programs; a computerized central room Reservation System; consulting programs; specifications and policies; and the like; and (without separate royalty) Food and Beverage and other services, if any, but only when offered under the Marks in accordance with System Standards. DIA reserves the right, from time to time, by adoption or amendment of System Standards, to add, amend, modify, delete or enhance any portion of the System (including any of the Marks and System Standards) as may be necessary in DIA's sole judgment, to change, maintain, or enhance the Days Inn System trade names or the reputation, efficiency, competitiveness and/or quality of the System, or to adapt to it new conditions, materials or technology, or to better serve the public. Licensee will, at its expense, fully comply with all such additions or modifications reasonably designated as applicable to then existing System licensees.

10.    <u>Proprietary Rights.</u>  Licensee acknowledges that DIA owns and licenses the System and that any use of the System, other than pursuant to this Agreement, would cause DIA irreparable harm for which there is no adequate remedy at law, entitling them to injunctive and other relief. Without limiting the foregoing:

(a)  (<u>Marks/System Usage</u>)  Licensee acknowledges and will not contest the validity of the Marks, and DIA's right to license the System. Licensee may not use, and does not acquire the right to use, the System or any Mark in any signage, advertising, stationery, supplies, linens, china or otherwise except in accordance with this Agreement and the System Standards, or with the prior written approval of DIA. Licensee may not apply for federal, state or foreign registration of the System or any Mark, or use any Mark in its legal or trade name.

(b)  (<u>Inurements</u>)  All uses, improvements and additions to the System (including any of the Marks) created or acquired by DIA, Licensee or any third party automatically inure to and become the property of DIA, as applicable.

(c)  (<u>Other Systems</u>)  DIA and its affiliates each reserves the right to own in whole or in part, and to manage, operate, use, lease, sublicense, franchise, license (as licensor or licensee) or joint venture (i) distinctive separate lodging and/or Food and Beverage marks which are not designated as part of the System, and to enter into separate agreements with Licensee and/or others (for separate charges) for use of any such non-System marks, and (ii) other hotels, restaurants and/or businesses, under the System or otherwise (including under third party and other marks) at any location whatsoever.

(d)  (<u>Status Notices</u>)  DIA may require Licensee to disclose (by signage, letterhead, written disclaimer, posted notice or otherwise) for any purpose, including any so-called state assumed name filing, or private

CINN192

5

or public offering of securities by or for the benefit of Licensee, that it is a System licensee only and not sponsored by or otherwise affiliated with DIA or their affiliates. Neither Licensee, its principals, nor its employees will represent to any actual or proposed lender, investor, guest, customer, supplier or other person or entity that DIA or their affiliates has an ownership interest in Licensee or the Unit, is or will be in any way responsible for Licensee's debts or acts, or is participating in any investment offering.

(e) (Litigation)  DIA may (but is not obligated to), at its option, defend and prosecute, for itself and/or on behalf of the Licensee any personal injury or property damage action naming DIA as a party.  Such control of any action will not limit or change obligations to insure and indemnify DIA under Section 16.  DIA will indemnify and defend Licensee against actual damages and monetary judgments incurred in actions brought by third parties against Licensee alleging infringement of the rights of such parties, by virtue of Licensee's proper use of the System in strict compliance with the System Standards, provided that DIA shall be obligated to defend Licensee in such actions only with counsel of its selection and under its control, and only after Licensee has given DIA written notice of any such action and has provided DIA with complete and accurate information then known by Licensee about the alleged infringement.  Licensee will, at its expense, extend its full cooperation in all such matters.  If such dispute or litigation results in whole or in part from any activity of Licensee in breach of this Agreement, Licensee will reimburse DIA's reasonable expenses (including, to the extent permitted by applicable law, attorneys' and accountants' fees) of resolving it.  DIA need not initiate suit against imitators or infringers, and may settle any dispute by grant of a license or otherwise.  Licensee will promptly upon discovery notify DIA in writing of any uses of Marks or names confusingly similar to those included in the System, and any litigation against Licensee related to the System.

(f) (Confidential Information)  Licensee agrees that prior to and during the Term, and thereafter for the lesser of 10 years or the longest time permitted by applicable law, to exercise its best efforts to preserve the confidentiality of any DIA trade secrets and other proprietary information not generally known in the hospitality industry (collectively "Confidential Information"), including confidential portions of the System Standards Manuals and Confidential Information contained therein or conveyed during training programs.  Licensee shall comply with all instructions in the System Standards Manuals for preserving confidentiality of Confidential Information.  Licensee shall use Confidential Information only to fulfill the Construction Obligation and then during the Term for the Unit and in furtherance of this Agreement, and will, upon termination of the License (or earlier, as requested by DIA), return to DIA all Confidential Information fixed in any tangible medium of expression (within the meaning of the U.S. Copyright Act), now known or later developed.

11.    System Standards.  DIA shall have the right to control and establish requirements for all aspects of the System, including without limitation

CINN192

for Marks usage, and for Unit construction, decoration, interior and exterior signage, quality assurance and guest service (collectively, the "System Standards") associated with the System. Without limiting the foregoing:

(a) (Specification)   DIA may from time to time specify the System Standards in its "Planning and Design Standards Manual", "Operating Policies Manual", "Purchasing Manual", and such successor and additional manuals as DIA shall put into use from time to time (collectively, and as amended from time to time, the "System Standards Manuals"), or otherwise, including without limitation, standards relating to:  (i) minimum Unit "Quality Standards", which include the Design Standards and other standards for cleanliness, maintenance, supplies, concession types, Food and Beverage service, vending machines, uniforms, staffing, employee training, replacement of F/F/E, decor, and other capital items, guest services, operations, guest comfort and other areas;  (ii) "Mark Standards" for interior and exterior Mark-bearing signage, china, linens, utensils, glassware, uniforms, stationery, supplies, advertising materials and other items, and with the right to specify which and how items used at the Unit or elsewhere shall omit or bear Marks;  (iii) "Design Standards" for new, upgraded or modified facilities, including standards for all aspects of unit design, construction materials, landscaping, interior decor, original and replacement F/F/E, operational uniforms, amenities and supplies and the like; and (iv) "Technology Standards" for communications, point of sale terminals and computer hardware and software for various applications, such as rooms management, records maintenance, marketing data, accounting, budgeting and the Reservation System; all of which Licensee agrees to meet, at its sole expense. DIA may, in its sole discretion, permit deviations from System Standards, based on local conditions and/or DIA's assessment of special circumstances.

(b) (Delivery of System Standards Manuals) At the first to occur of the training programs described in Section 14 or earlier in DIA's discretion, and after Licensee and others acting on its behalf execute any confidentiality agreement required by DIA, Licensee will receive on loan from DIA one copy of each of the System Standards Manuals in their then current form. DIA then will add Licensee to its mailing list to receive amendments, replacements and supplements thereto. Licensee shall comply with the System Standards Manuals as amended, replaced and supplemented from time to time.

(c) (Inspections) DIA has the unlimited right to create, implement and modify from time to time a standard inspection scoring system and to conduct unannounced inspections in accordance with such scoring system of the Unit's premises, operations, records and Marks usage both prior to and then during the Term, to ascertain Licensee's compliance with System Standards and other provisions of this Agreement.   DIA's representatives will conduct Unit inspections at such times annually during the Term in accordance with the System Standards in effect from time to time. Licensee shall pay the travel, lodging and meal expenses of DIA's representatives associated with any reinspection of the Unit necessitated by the Unit's failure to meet Quality Standards on any

CINN192

7

prior inspection. Licensee acknowledges that all inspections under this paragraph (as well as any review and approval of Licensee's Approved Building Plans and/or the Unit) are solely for the purposes of ascertaining compliance with System Standards. Neither DIA, its affiliates, nor their representatives, agents or contractors assumes any responsibility or liability to Licensee, its lenders, contractors, employees, guests or others by reason of such inspections or approvals.

12.  <u>Reservation System.</u> DIA, its affiliates and/or subcontractors, will, at its expense, maintain (directly or by subcontracting with one or more third parties) a computerized central "Reservation System" with a national toll-free telephone access number and/or such technological substitute(s) and/or supplement(s), as DIA determines in its sole discretion, for making reservations at System units. Licensee will, during the Term, participate in the Reservation System and comply with all related System Standards set by DIA in its System Standards Manuals or otherwise in writing, including, without limitation, standards for (i) purchase or lease and maintenance of computer/teletype terminal equipment, communications equipment and service, and/or computer hardware and software; and (ii) honoring prepaid, confirmed, guaranteed and other reservations for the Unit accepted through the Reservation System. Licensee shall not use the Reservation System to refer guests, directly or indirectly, to any non-System hotel. Licensee shall be solely responsible for (and shall indemnify and hold DIA harmless against) overbooking of its guest rooms, through the Reservation System or otherwise. Licensee shall pay any and all of the Location's telephone line connection charges, supply costs and other such expenses of participating in the Reservation System. The Unit may be suspended from the Reservation System, receiving no further reservations, without prior notice during any period when Reservation Fees are past due, or if non-standard computer hardware is used by Licensee and such hardware is not able to perform all reservation terminal functions at the time of initial installation or over a specified period thereafter. DIA may, in its sole discretion, after reasonable notice to Licensee, cause Reservation System referrals to the Unit to cease for the duration of any default by Licensee in the performance of its other obligations under this Agreement, and without notice may divert reservations made for arrivals scheduled on or after the date of the default, or if the License is terminated, the date of termination to other System units. Licensee waives all claims against DIA (or their subcontractors) arising from any proper removal of the Unit from the Reservation System under this Section 12.

13.  <u>Marketing.</u>

(a) (<u>National Advertising</u>) DIA, directly or through its affiliates and at its sole discretion and expense, will implement national advertising and other marketing programs to enhance and promote public awareness and patronage of System units.

(b) (<u>Directories</u>) During the Term, DIA will provide Licensee with System unit "Directory" copies, at least including the names and

CINN192

8

addresses of System members.  Licensee will prominently display the current edition of the Directory in each Unit guest room, and at such other locations within the Unit as requested by DIA.

(c)  (DIA Local Advertising)  DIA, directly or through its affiliates and at its sole discretion and expense may implement local advertising and/or marketing programs, which may or may not encompass the Unit.

(d)  (Group Bookings)  DIA, at its sole discretion, may offer Licensee, through the Reservation System or otherwise, group bookings at the Unit solicited by its national sales force (if any) and charge Licensee fees for such services.

(e)  (Licensee Local Advertising)  Licensee shall, at its expense, generate a local advertising program, including at least appropriate off-Location and Location signage, beginning after the Commencement Date and not before, except that Licensee may utilize the pre-Commencement Date local advertising and signage program specified in the System Standards Manuals.  All Licensee advertising programs and materials must comply with System Standards.  DIA shall have the right to compel Licensee to cease using any advertising materials not in compliance with System Standards, or which use out-dated or abandoned graphics or copy.

(f)  (Licensee Cooperation)  Licensee, at its expense, will cooperate with and participate in such marketing programs as DIA may reasonably request in writing, such as participation in special promotional and frequent traveler programs, marketing programs, marketing research programs, and the display and use of System brochures, Directories and in-room "paper tent" or "flyer" promotional materials.

14.  **Training and Consulting Services.**

(a)  (Minimum Training)  Within the times and as set forth from time to time in the System Standards Manuals, DIA, its affiliates or designees shall provide, and employees of the Unit designated by DIA must attend training programs including, without limitation, a hospitality management training program, and a recurrent field training program for Licensee's general manager(s), which must be completed to DIA's satisfaction at a location designated by DIA and such other training programs as may be mandatory under the System Standards from time to time.

(b)  (Optional Property Training Program)  If Licensee so elects and subject to DIA's scheduling requirements, DIA designees will provide in the Unit or other agreed location, a "Property Training Program" (at DIA's discretion as to length) to assist the Licensee in preparing for the Opening Date.  The Property Training Program will be offered to Licensee at no charge other than for the reasonable expenses for travel, room, board and other out-of-pocket costs of DIA's designees.

(c)  (Supplemental Training)  DIA may, at its sole discretion and expense, from time to time hold special training sessions at a location



designated by DIA or other designated location(s) and require attendance of designated Licensee employees.

(d) (Training Expenses) Mandatory training shall be provided by DIA without tuition charge, except that DIA shall have the option to charge reasonable tuition for Licensee's replacement persons attending under Sections 16, paragraph (b) or 17, paragraph (a), and for cancellation of training program commitments or reservations by Licensee or its employees within 30 days (or such shorter period as DIA may specify) prior to the start of any training program. DIA may charge (i) tuition for optional training other than the Property Field Training Program (including training at mandatory sessions of persons in addition to those required by DIA to receive such training), and (ii) fees for instructional materials. Licensee will bear all travel, lodging, food and other out-of-pocket attendance expenses of its training program attendees.

(e) (Free Consultation) Appropriate, qualified DIA representatives who are at the Unit for compliance inspections pursuant to Section 11, paragraph (c) shall be available during such visits for reasonable Unit operations consultation at no cost to Licensee. In addition, DIA will provide Licensee reasonable Unit operations consultation services by telephone and mail.

(f) (Annual Franchise Conference) DIA (or an affiliate) may, but is not obligated to, conduct an annual franchise conference, at a location and on a date selected by DIA, covering a program specified by DIA, at its sole discretion. If such a conference is held, DIA may charge Licensee the Annual Conference Fee as set forth in Section 8 hereof. DIA may provide training and consulting services at the conference. Upon payment of the Annual Conference Fee, Licensee will be authorized to send one unit representative to the conference. Additional unit representatives may be sent subject to compliance with DIA's conference policies and procedures and after payment of any additional conference fees.

15.    Approved Supplier Lists/Purchasing Services. DIA shall have the right, at its discretion, to designate in a "Purchasing Manual" services or products of suppliers as "System-Approved", to maintain a "System-Approved Supplier" list of such approved suppliers, and to issue from time to time, in the Purchasing Manual, a catalog or another format, lists of System-Approved Suppliers and/or materials, F/F/E, finishes, supplies, services, and the like which meet System Standards. DIA or an affiliate will make available to Licensee optional "Purchasing Services", for supplying goods and services, meeting System Standards. Licensee will pay upon receipt all invoices for orders placed by or through Purchasing Services. Licensee is not obligated to use Purchasing Services, or to purchase non-Mark-bearing products or services which otherwise meet System Standards from System-Approved Suppliers. Mark-bearing items shall be purchased only from System-Approved Suppliers. DIA will publish in its System Standards Manuals procedures by which Licensee-selected sources of Mark-bearing items and

CINN192

other things may apply to become System-Approved. Any contract (including its prices, terms and conditions) which results from System-Approved Supplier lists shall be strictly between the System-Approved Supplier and Licensee; and DIA shall not be deemed to be a seller, distributor, title-holder or warrantor of any products or services so purchased. DIA, FOR ITSELF, DIA AND ITS AFFILIATES, DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES CONCERNING SYSTEM-APPROVED PRODUCTS OR SERVICES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES AS TO MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AVAILABILITY, QUALITY OR PRICING. Licensee acknowledges that DIA may receive fees, commissions, field of use royalties, or other consideration from System-Approved Suppliers based on their sales to or royalties received from System licensees, whether through Purchasing Services or System-Approved Supplier lists.

16.    Additional Licensee Duties.

(a) (Compliance with System Standards) At Licensee's expense and in accordance with System Standards Licensee will (i) decorate, furnish, equip and maintain in good condition and repair, the Unit (including all common areas, parking facilities, walkways, recreational facilities, amenities and the like at the Location) free from patent defects, discovered latent defects and environmental hazards; and (ii) operate the Unit in a clean, sanitary, safe and orderly manner, providing courteous service and high quality accommodations to the public.

(b) (Management) Licensee will cause the Unit to be managed by Licensee's employees (or its owners) who have completed to DIA's satisfaction a Hospitality Management Program. If Licensee adds or replaces any Unit manager, it will (at Licensee's expense, including reasonable tuition) send each such new employee to any required training program before, to the extent practicable, otherwise as soon as possible after, the date of first assuming management duties. Licensee may contract with a third party for management of the Unit only with DIA's prior written consent to any management agreement, which at DIA's sole discretion, may be denied or conditioned on the inclusion or exclusion of terms in the management agreement.

(c) (Special Efforts) Licensee will exercise all reasonable efforts under the circumstances to (i) maximize the good will of the System units, guest satisfaction with, and usage of, the Unit so long as it is operating under the System, and recommend and promote all other System units and activities; (ii) provide Unit guests such complimentary items and services as DIA from time to time reasonably specifies in System Standards Manuals; (iii) recognize and accept for the purpose of identification and credit, all credit or consumer debit cards which DIA now or hereafter specifies in writing; (iv) maintain sufficient working capital and maintenance and renovation reserves to enable it to fulfill its Agreement obligations; and (v) not allow its executive officers, general partners, employees, representatives, or guests to engage in conduct which is unlawful or damaging to the good will of the System.

C1NN192

11

(d) (<u>Accounting System</u>) Licensee will maintain books and records of the Unit in accordance with the <u>Uniform System of Accounts for Hotels</u>, (8th Rev.Ed. 1986) as amended from time to time, and as adopted by the American Hotel & Motel Association, or at DIA's option such other uniform system of accounts as DIA may from time to time reasonably specify in writing, and preserve such books and records for at least 3 years from their respective preparation dates (even if after termination of the License).

(e) (<u>Monthly and Other Reports</u>) Licensee will send DIA at DIA's request in each case, on or before the tenth day of each month (or portion thereof), together with payment of all Continuing Fees then due, a written monthly operating report in the form prescribed by DIA (a "Monthly Report"), showing required information (including monthly and year-to-date financial information, occupancy data and average daily room rates), and the computation of all Continuing Fees accruing for the preceding month. Licensee will submit to DIA all such other reports, data and information as DIA may from time to time reasonably require.

(f) (<u>Semi-Annual and Annual Reports</u>) Licensee will send DIA at DIA's request and, in the form prescribed by DIA: (i) within 45 days after the end of the Unit's second operating quarter of any Unit operating year, an unaudited 6 month profit and loss statement and balance sheet as at the end of the second operating quarter; and (ii) within 120 days after the end of any Unit operating year, an annual profit and loss statement and balance sheet as at the end of the fourth operating quarter, and a separate statement of Gross Room Revenues for the year then ended. Such annual financial statements shall be audited if an independent audit is required by Licensee's lenders or otherwise performed; otherwise, they shall be accompanied by the written certification of Licensee's chief executive officer and chief financial officer, if any, that all Unit transactions have been accurately recorded and are properly reflected in the books and records of the Unit.

(g) (<u>Food, Beverage and Other Services</u>) Licensee shall operate the approved Food and Beverage and other services as shown on Schedule B for the Term, unless it first obtains DIA's consent to add to, modify or discontinue such services. Licensee shall obtain DIA's written consent before commencing Food and Beverage services not specified on Schedule B, or entering into any subcontract or lease with third parties for Food and Beverage and other services at the Unit, provided that subcontracted or leased services shall be subject to Quality Standards and insurance requirements as set forth in the System Standards Manuals. "Food and Beverage" service shall include any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Unit.

(h) (<u>Ownership Changes</u>) In addition to any applicable requirements of Section 17, Licensee will notify DIA in writing on such form(s) as DIA specifies in its System Standards Manuals and at least 5 days in advance of the occurrence, of any change through a single or series of related

CINN192

transactions of (i) 25% or more of the beneficial ownership of Licensee, or (ii) any percentage of the ownership of the Unit, if not owned by Licensee. If Licensee is a partnership or joint venture, it will notify DIA as soon as practicable of the death or unplanned retirement of any general partner and/or any cumulative change of 25% or more in the right to receive distribution of Licensee's profits and losses. Licensee shall, from time to time, but only if DIA so requests, provide DIA with lists of equity owners of Licensee and/or the Unit, and their respective interests.

(i) (Courtesy Lodging)  Licensee shall provide Unit lodging at the Days Inn System "Employee Rate" established in the System Standards Manuals from time to time, to DIA's employees and representatives traveling on business, but shall not be obligated to provide more than three standard guest rooms for such purpose at the same time.

(j) (Minor Renovations)  Beginning on the second anniversary of the Commencement Date, and in addition to Licensee's obligations under Sections 9, 10 and 11, DIA may issue to Licensee a written "Minor Renovation Notice" given at least 60 days in advance of any required commencement date and not sooner than the third anniversary of the date of any prior written Minor Renovation Notice, that Licensee must then comply with (by the date specified in the notice) reasonable Unit upgrading and renovation requirements (a "Minor Renovation"), having an aggregate cost for labor, F/F/E and materials estimated by DIA to be not more than the "Minor Renovation Ceiling Amount". The Minor Renovation Ceiling Amount shall be the product of $1,000.00 multiplied by the number of licensed Unit guest rooms, and shall be adjusted each March 1 beginning on March 1, 1989 by multiplying the $1,000.00 factor by the "Adjustment Factor," which is a fraction, the numerator of which is the "Consumer Price Index - Seasonally Adjusted U.S. City Average For All Items For All Urban Consumers (1982-1984=100)", published monthly by the Bureau of Labor Statistics, United States Department of Labor ("CPI-U"), for the month of January of the year of computation, and the denominator of which is the CPI-U for January, 1988. The Minor Renovation Ceiling Amount factor is $1,163.35 on the date hereof. In no event shall any annual increase in the Minor Renovation Ceiling Amount exceed 6% of that Amount for the preceding year. If CPI-U is discontinued, comparable statistics on the purchasing power of the consumer dollar published by the United States Department of Labor, or a responsible financial periodical or recognized authority selected by DIA shall be substituted. DIA's computation of the Minor Renovation Ceiling Amount shall be binding and conclusive in the absence of manifest error.

(k) (Major Renovations)  In addition to any renovations required by DIA to correct any Unit failure to meet the Quality Standards or the Design Standards, DIA may, not more than once during the Term and only between the fourth and the sixth anniversaries of the Commencement Date, issue to Licensee a "Major Renovation Notice" given at least 180 days in advance of the required commencement date, of major Unit upgrading and renovation requirements (a "Major Renovation") (which may include structural changes, additions to and modifications of facilities) having an aggregate cost for design, labor, F/F/E and materials estimated by

CINN192

DIA to be not more than the "Major Renovation Ceiling Amount" and necessary to meet DIA's then System Standards (collectively, the "Renovation Obligation"). The "Major Renovation Ceiling Amount" shall be the product of $10,000.00 multiplied by the number of licensed Unit guest rooms, and shall be adjusted each March 1 beginning on March 1, 1989 by multiplying the $10,000.00 factor by the Adjustment Factor. The Major Renovation Ceiling Amount factor is $11,633.53 as of the date hereof. In no event shall any annual increase in the Major Renovation Ceiling Amount exceed 6% of that Amount for the preceding year. Licensee shall, unless it opts to exercise its Section 19, paragraph (a) termination rights and pays the amounts required thereunder, comply with the Renovation Obligation by the "Completion Date" specified in DIA's notice. Licensee may not operate the Unit under the System after the Completion Date (or such later date as the parties in writing agree) unless prior to such date Licensee receives DIA's written certificate that Licensee has satisfied the Renovation Obligation.

(1) (Unit Modifications) Licensee will not modify, diminish or expand the Unit (or change its interior design, layout, F/F/E, or facilities) without the prior written consent of DIA. Licensee shall pay with any request to expand the Unit, DIA's then current "Rooms Addition Fee" for each guest room to be added (which shall be no more than the Initial Fee per guest room then in effect). Licensee shall obtain DIA's written approval of the plans and specifications for such additions prior to commencing the proposed work. No rooms or facilities addition or modification of existing facilities, even though previously approved in concept, shall be opened to the public unless and until a DIA representative inspects the premises and certifies in writing that the addition or modification meets System Standards.

(m) (Audits) Licensee will permit, during the Term and for 3 years thereafter, without prior notice, DIA and/or any independent accountants selected by DIA to audit, in person or by electronic access, any Unit financial records. If such audit discloses a deficiency in any of the Continuing Fees due DIA, Licensee shall pay the deficiency and accrued interest within 10 days after receipt of the audit report. If the deficiency is greater than 3% of the amount of Continuing Fees paid for the period as to which the deficiency exists, then Licensee shall pay the audit's reasonable costs. If the audit discloses an overpayment of Continuing Fees, DIA will refund it to Licensee within 10 days after delivery of the audit report to DIA. After three or more such audits during the Term each result in a determination that a deficiency exists for which Licensee is obligated under this paragraph (m) to pay the audit's reasonable costs, then DIA shall have the option, in its sole discretion, to require, by written notice given to Licensee prior to the start of any Unit operating year, that annual financial statements be certified by an independent accounting firm for that year and any subsequent years specified by DIA.

(n) (Indemnifications) Licensee will indemnify, hold harmless, to the extent permitted by applicable law, and defend DIA, its parent, corporate affiliates and their respective employees, officers, directors, agents, representatives, successors and assigns

CINN192

14

(collectively, "Indemnities") from and against any loss, cost, damage, liability, expense (including actual accountants' and attorneys' fees) incurred by any Indemnitee in any way directly or indirectly relating to or arising out of any claim, case or controversy about the acquisition, equipping, renovation, design, planning, demolition, financing, construction, operation, occupancy, maintenance, repair, or use of the Unit and/or Licensee's breach of Section 22 warranties, including without limitation, amounts paid to resolve disputes with Unit guests, and in cases alleging any Indemnitee's negligence in the supervision and inspection of the Unit, the training of Unit employees, and the specification of System Standards, but excluding any case in which the Indemnitee is held to have engaged in gross negligence or willful misconduct.   This indemnification shall survive termination of the License and this Agreement.

(o) (Insurance)  Licensee will maintain at its sole expense from the date of this Agreement, for the Term and so long as the Unit is identified as a System unit, and for the period of Unit construction before the Commencement Date, such duly paid insurance as may be required as the Unit's mortgagee and/or Licensee's other lenders, and, to the extent greater: (i) on and after the Commencement Date, "all risk" property coverage for the Unit with limits no less than 80% of replacement cost, with an endorsement if the Unit is in a flood plain, for floods; plus (ii) comprehensive broad form public and premises general liability insurance for the benefit of both Licensee and the Indemnities, with endorsements covering at least contractual liability, innkeeper's liability, safe deposit liability (if applicable), liquor liability (if alcoholic beverages are served), personal injury liability (with employee exclusion deleted); (iii) workers' compensation and employer's liability; (iv) automobile liability coverage on owned, non-owned and hired vehicles used for Unit business; and (v) umbrella liability coverage.  All coverages shall be on an occurrence basis and in at least such minimum amounts together with such other coverages, as DIA may from time to time reasonably direct in System Standards Manuals, from an insurer(s) acceptable to DIA, naming DIA, and any affiliate of DIA as may then own the License Agreement as additional insureds on all coverages except the "all risk" property coverage, and without right of subrogation against Indemnities.  Each such policy shall provide that it may not be cancelled, terminated or materially changed without 30 days prior written notice to DIA.  Licensee shall promptly deliver to DIA evidence of the inception and each renewal or replacement of such insurance coverage (failure of DIA to request evidence of the coverages it requires Licensee to maintain shall in no way constitute a waiver of the requirement).  Licensee acknowledges that it has been advised of DIA's current minimum insurance requirements.

17.    Licensee: Assignments, Transfers and Subcontracts.

(a) (Consent Required)  This Agreement is personal to Licensee.  DIA is relying upon the exercise of skill, judgment and discretion by Licensee and its principals.  Accordingly, and only subject to the first lien construction period and/or permanent Unit financing and refinancing

CINN192

15

thereof to which DIA's consent is not required, Licensee will not lease the Location or the Unit, and will not engage in or suffer the change, assignment, transfer, conveyance, or pledge, except with DIA's prior written consent (which may be withheld or conditioned in its sole discretion) directly, indirectly, or pursuant to several related transactions, or by operation of law (other than to a "Permitted Transferee") of: (i) any rights under this Agreement; (ii) on a cumulative basis, 50% or more of the equity interests in Licensee from the persons and amounts shown on Schedule A; (iii) any lesser percentage of Licensee's equity that constitutes effective control of Licensee; (iv) rights, duties or interests of any general partner of Licensee, including the admission of any substituted or additional general partner; or (v) any interest in the legal or equitable title to the Unit, or if leased by Licensee, the lessee's leasehold interest to the Unit. The term "equity interests" shall include all options, warrants and instruments convertible into conventional equity securities. If Licensee is a corporation; Licensee shall not, except with DIA's prior written consent (which may be withheld or conditioned in its sole discretion) merge, consolidate or issue additional stock in Licensee in a transaction which would have the effect of diluting the prior Licensee owners' combined interests in the surviving entity to less than 51%. If at least the majority of the equity securities of Licensee are registered under the federal Securities Act of 1933, as amended, or are a class of securities registered under the Securities Exchange Act of 1934, as amended, or are listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), then such registered equity securities shall be freely transferable without the application of this Section 17 except in a single transaction or a series of related transactions involving the transfer of more than 50% of the outstanding equity securities of Licensee (other than a repurchase thereof by Licensee). DIA may, to the extent permitted by applicable law, condition its consent upon the receipt of general releases from the assignor and each of its owners, the payment of the then transfer Application Fee and Initial Fee, execution of the then current System license agreement or an assignment and assumption agreement provided by DIA, upgrading of the Unit to meet then System Standards and payment of all amounts then owed DIA and their affiliates by Licensee under this Agreement or otherwise. A "Permitted Transferee" shall be any natural person(s) receiving the interest transferred without consideration by will, trust or intestate succession (but not by gift or by divorce settlement or decree), provided that such Permitted Transferee(s) agrees, in writing, to be bound by (at DIA's option) this Agreement or the License Agreement form then used for new licensees, and pays DIA its then effective "Processing Fee" for handling the transfer. All transferees (including Permitted Transferees) shall complete a training program, as DIA requires, at the Licensee's or transferee's expense (including reasonable tuition). Any attempted transfer, assignment or pledge which is not in accordance with this paragraph shall be void and shall give DIA the right to terminate the License and exercise other rights and remedies, including those under Sections 19 and 20, and Licensee shall nevertheless continue to be liable for Continuing Fees. DIA will use all reasonable efforts to process any

CINNJ92

transfer consent request within 30 days after DIA's receipt of all pertinent information.

(b) (First Refusal Rights)  Licensee shall advise DIA in writing (attaching conformed copies of all applicable agreements as executed) at least 30 days in advance of the closing date specified in any executed contract for the sale of the Location or the Unit, whether by conveyance of the Unit or by means of a transfer described in clauses (ii) or (iii) of paragraph (a) of this Section 17, DIA (or any affiliate) shall have the right and option, exercisable by sending written notice of exercise to Licensee on or before 5:00 p.m. New York time on the fifteenth business day after receipt of such notice, to purchase the Unit on the same terms and conditions as in the executed contract of sale. DIA may elect instead to pay the purchase price (including the fair market value of any non-cash purchase price terms) in cash at closing, provided, that DIA shall not be responsible for payment of any third party finders or brokerage fees, or for any non-cash or non-purchase price terms of the offer. If either a like kind exchange within the meaning of Section 1031, or a reorganization within the meaning of Section 368(a)(1)(A) or (B), both Sections of the Internal Revenue Code of 1986, as amended, is contemplated with respect to all or part of the purchase price, DIA may elect to pay in cash an amount equal to the fair market value of the offeror's property or securities to be exchanged or issued (as determined by an appraiser selected solely by DIA) offered by the third party. Any change in such terms or such purchaser, or any failure to complete such sale within 6 months after the date Licensee gives such notice to DIA, shall be treated as a new offer, entitling DIA to new first refusal rights. DIA's right of first refusal as to transfers described in paragraph (a), clauses (ii) and (iii) of this Section 17 shall arise: (i) if, prior to one year after the Commencement Date, the business of Licensee consists mainly of the Unit; and (ii) thereafter only if 75% or more of Licensee's gross revenues for the 12 months preceding the month in which the offer is received arise from the Unit and on-Location Food and Beverage service. Licensee shall, if DIA so requests, execute such documents as DIA deems necessary or desirable, or DIA may file its affidavit, including all or parts of this Agreement, to record DIA's first refusal rights against the Location or its equity interests.

18.  DIA Assignments and Subcontracts.  DIA may assign or subcontract all or any part of its rights and duties under this Agreement, including by operation of law, without notice and without Licensee's consent.

19.  Termination.

(a) (Licensee Termination.)  If DIA gives Licensee a Major Renovation Notice, Licensee may (in lieu of complying with the Renovation Obligation) terminate the License by giving DIA at least 90 days prior written notice of the termination date and tendering with such notice a Termination Fee (to compensate DIA for lost revenues in an amount difficult to ascertain, and not as a penalty) in an amount equal to 100% of Licensee's aggregate Monthly Royalties which accrued with respect to

CINN192

17

the Unit during the 18 full months immediately preceding the giving of such notice by Licensee, but not less than the product of $1,000.00 multiplied by the number of licensed Unit guest rooms, plus any applicable Taxes. The $1,000.00 factor shall be adjusted annually on each March 1 beginning March 1, 1989 by multiplying such amount by the Adjustment Factor. The Termination Fee is at least $1,163.35 per guest room on the date hereof.

(b)  (*PIA Termination with Notice*.)  DIA may terminate the *License*, or if the License is not then in effect, this Agreement, at any time effective upon the date specified in the termination notice (or the earliest date permitted by applicable law) if:  (i) Licensee fails to submit monthly reports then due under Section 16, paragraph (e) within 10 days after receipt of DIA's written demand for submission thereof; (ii) Licensee fails to pay any amount then due to DIA under this Agreement or otherwise within 10 days after receipt of DIA's written payment demand; (iii) Licensee fails fully to remedy any other breach of its obligations or warranties under this Agreement within 30 days (5 days for breach of Section 10, paragraph (f)) after receipt of written notice from DIA specifying one or more breaches of this Agreement, or such longer time as DIA may in writing allow; (iv) Licensee loses possession or the right to possession of all or a significant part of the Unit; (v) Licensee defaults in the performance of the terms and conditions of any other agreement with DIA or their affiliates, or any mortgage, deed of trust or lease covering the Unit, and fails to cure such default within the time permitted by the applicable instrument; (vi) Licensee knowingly maintains false books or records, or knowingly submits any false report to DIA; (vii) Licensee fails to pay its debts generally as they fall due; (viii) Licensee shall receive two or more notices of default under this Agreement for the same or a similar cause or reason in any twelve month period, whether or not cured; (ix) Licensee makes or made any misstatement or omission of any material fact in connection with this Agreement or its DIA license application; or (x) Licensee fails to deliver within 60 days after the execution and delivery of this Agreement by DIA any other agreement with DIA or any other document, deed, instrument, certificate or writing relating to Licensee (including its owners, partners, officers, directors or finances), the Location, the Unit, or this Agreement requested by DIA in writing at or prior to execution of this Agreement by DIA, provided that DIA may exercise its right to terminate under this clause whether or not the Term commences but may not exercise this right after Licensee delivers all such required materials. In any judicial proceeding in which the validity of termination is at issue, DIA will not be limited to the reasons set forth in any notice sent under this Section.

(c)  (*DIA Termination Without Notice*.)  DIA may, in its sole discretion, immediately terminate the License, or if the License is not then in effect, this Agreement, without notice (or at the earliest time permitted by applicable law) if: (i) Licensee violates or suffers a violation of Section 17; (ii) the Unit ceases to be operated under the System after the Commencement Date; or (iii) Licensee contests in any court proceeding the ownership of or DIA's right to license the System or any part of it, or the validity of any of the Marks. The License, or

CINN192

18

if the License is not then in effect, this Agreement, shall automatically and immediately terminate without notice if any involuntary proceeding in bankruptcy is filed against the Licensee which is not dismissed within 60 days of filing, any voluntary proceeding in bankruptcy is filed by Licensee, Licensee is dissolved or liquidated, a receiver is appointed for Licensee or the Unit, or Licensee makes any assignment for the benefit of creditors.

(d) (Casualty and Condemnation)  If the Unit suffers destruction or significant damage by act of God or other event beyond Licensee's reasonable anticipation and control such that the Unit ceases to be operated in the normal course of business, Licensee shall promptly notify DIA in writing of the casualty event, giving information as to the availability of guest rooms and the Unit's ability to honor advance reservations. Licensee shall advise DIA in writing within 30 days after the casualty event whether it will restore, rebuild and refurbish the Unit to comply with the Approved Building Plans, which must be completed within 180 days after the casualty event, or it elects to terminate the License, effective as of the date of notice. Licensee's failure to make such an election within the time permitted shall be deemed an election to terminate the License. Any termination under this paragraph shall require no payment of Section 20 Liquidated Damages, provided Licensee pays all amounts owed to DIA accruing prior to the effective date of termination within 10 days after the termination notice is given or deemed to occur, and Licensee follows the post termination requirements in Section 21. Once undertaken, Licensee's failure to complete the restoration of the Unit on time or to pursue the same diligently shall permit DIA to terminate the License under Section 19, paragraph (b), clause (iii). If the Unit is condemned, or such a substantial portion of the Unit shall be condemned such that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or the Unit or the substantial portion is sold to the condemning authority in lieu of condemnation, then the License will be deemed terminated on the date the Unit or substantial portion is conveyed to or taken over by the condemning authority. No Section 20 Liquidated Damages will be owed by Licensee in the event of such condemnation or sale if Licensee notifies DIA about the condemnation within 10 days after it receives formal notice from the condemning authority and then pays DIA all amounts due under this Agreement or otherwise within 30 days after the deemed termination date.

(e) (Non-Waiver) Termination of the License by DIA or Licensee does not waive any Licensee obligation for accrued, unpaid Continuing Fees (including interest) or other liabilities and obligations arising out of any acts or omissions of Licensee prior to the effective date of License termination; and does not waive any obligations of the Licensee to perform all applicable provisions of this Agreement after such termination. DIA reserves all rights at law or in equity, whether or not DIA first terminates the License, including without limitation the right to collect from Licensee by suit or otherwise all amounts due and to remove the Unit from the Reservation System.

CINN192

20.    **Liquidated Damages.**  If the License terminates by action of the Licensee or under Section 19, paragraphs (b) or (c), Licensee shall pay DIA within 30 days following the date of such event, as "Liquidated Damages", an amount equal to the sum of the Monthly Royalties which accrued with respect to the Unit during the immediately preceding 24 full calendar months (or such shorter period as equals the unexpired Term at the date of termination, calculated in days, without regard to any express right to terminate the License prior to the expiration of the Term), but in no event less than the product of $2,000.00 multiplied by the number of licensed Unit guest rooms, plus any applicable Taxes assessed on such payment.  The $2,000.00 factor shall be adjusted annually on each March 1, beginning March 1, 1989, by multiplying such amount by the Adjustment Factor.  The Liquidated Damages Amount is at least $2,326.70 per guest room on the date hereof.  If the License Agreement terminates prior to the Commencement Date, Licensee shall pay DIA within 30 days following the date of termination Liquidated Damages in an amount equal to the product of $500.00 multiplied by the number of Unit guest rooms, plus any applicable Taxes.  The $500.00 factor shall be adjusted each March 1, beginning March 1, 1990, by multiplying such amount by the adjustment factor.  This factor is $581.68 as of the date hereof.  Payment of Liquidated Damages shall be in addition to all other DIA rights to obtain equitable relief, to collect amounts owed it accruing prior to termination of the License, and to enforce survival of the indemnification by Licensee under Section 16, paragraph (n).  The parties acknowledge that the injury caused DIA by Licensee's breach is difficult or impossible of accurate estimation, that they intend to provide for compensation for damages and not as a penalty and that the stipulated method of computation constitutes a reasonable pre-estimate of DIA's probable loss resulting from such Licensee breach.

21.    **Licensee's Duties At and After Termination.**  Upon termination of the License or this Agreement for any reason whatsoever:

(a)    **(System Usage Ceases)**  Licensee shall immediately desist from representing and holding out to the public that it is a System member, and shall cease using the System, including all Marks and Mark-bearing menus, supplies, signage, stationery, F/F/E, and other personalty, and comply with all post-termination procedures specified in the System Standards Manuals.  Licensee shall promptly take appropriate steps to cancel any assumed or fictitious name filing which includes any Mark.  Any post-termination Mark usage by Licensee shall be deemed a willful infringement of DIA's Lanham Act and other rights.

(b)    **(Other DIA Remedies)**  DIA (or its representatives) may immediately remove the Unit from the Reservation System and divert reservations as set forth in Section 12.  DIA may also, to the extent permitted by applicable law, and without prior notice of any kind, enter the Location, and any other parcels, remove equipment of DIA, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage not removed or obliterated by Licensee on or before the effective date of License termination.  DIA's cost of removing signage will be paid or reimbursed by Licensee, and will be

added to the amounts of accrued, unpaid Continuing Fees to be collected from Licensee, net of the $10.00 purchase price for such signage. DIA shall exercise reasonable care to avoid undue damage in removing and/or painting over signage, but shall have no obligation or liability to restore or repair damage to the Unit premises or equipment resulting therefrom. DIA may give notice to any lessor of Mark-bearing signage or other items to remove such signage and items and terminate the lease obligation of Licensee.

(c) (Mark-Bearing Items) DIA shall have the right (subject to the requirements of applicable laws), but not the obligation, to purchase some or all of the Unit's Mark-bearing F/F/E and supplies at the lower of their cost or net book value, with the right to set off the aggregate purchase price thereof against any sums then owed DIA by Licensee.

(d) (Advance Reservations) Licensee will honor any advance reservations, including group bookings, made for the Unit prior to termination at the rates and on the terms established when the reservations are made.

22.  Representations and Warranties. The parties disclaim any representation, covenant, or warranty, express or implied (including validity or registrability of any Mark, the tax consequences or potential profitability of the transactions contemplated by this Agreement, or the value or quality of any services or products purchased by Licensee in furtherance of this Agreement), except as expressly set forth in this Agreement, and except that Licensee expressly represents and warrants to DIA as follows:

(a) (Quiet Enjoyment) It is the fee simple title holder or ground lessee of the Location and will continue to be entitled to possession of the Unit during the entire Term without restrictions that would interfere with its performance under this Agreement.

(b) (Expertise) It has (or will employ persons or management firms approved under Section 16, paragraph (b) which have) the necessary management expertise and experience to design, construct, acquire, develop, equip, operate, market, maintain, and manage the Unit.

(c) (Assumes Risks) It has received, at least 10 business days prior to execution of this Agreement, read and understood DIA's current FRANCHISE OFFERING CIRCULAR FOR PROSPECTIVE FRANCHISEES (which circular includes a copy of the form of this Agreement), including the disclaimers regarding earnings claims on the inside front cover and in Item XIX therein, and had ample opportunity to consult with its advisors. It acknowledges that the reasons for termination under Sections 4 and 19 constitute good cause, and that the notice provisions relating thereto constitute reasonable notice. It has independently investigated the risks of the transactions contemplated hereby, and either (i) has substantial prior experience in the construction and operation of hotels and/or motels, or (ii) has obtained, relies with confidence upon, and acknowledges that DIA does not warrant the validity of (even if obtained

CINN192

at DIA's request), advice of third parties with such prior or similar experience, or information from existing and former Days Inns licensees, and/or a positive market feasibility study for the Location from an independent accounting or consulting firm.

(d) (Compliance with Laws)  The Unit will be built and operated in compliance with all local, state and federal laws, ordinances, rules and regulations.  Licensee will certify from time to time, as DIA may reasonably require, that it is in compliance with all applicable laws and regulations, and has obtained and maintained all necessary licenses and permits.

(e) (Taxes)  It will file all required tax returns, and pay when due all required taxes.

(f) (No Misrepresentation)  All written information provided to DIA about the Unit, or the Licensee, the principal owners of Licensee, any guarantor, or the finances of any such persons or entities, was or will be at the time delivered, true, accurate and complete, and such information contained no misrepresentation of a material fact, and did not omit to state any material fact necessary to make the information disclosed not misleading under the circumstances in which it was disclosed.

(g) (Authority)  Licensee has full power and authority and has been duly authorized, to enter into and perform its obligations under this Agreement, all necessary approvals of any Board of Directors, shareholders, partners, co-tenants and lenders having been obtained. The execution, delivery and performance of this Agreement by Licensee will not violate, create a default under or breach of any charter, bylaws, agreement, indebtedness, certificate, order, decree or security instrument to which Licensee or any of its principals is a party or is subject, or to which the Unit is subject.  Licensee or the Unit is not the subject of any current or pending dissolution, receivership, bankruptcy, reorganization, insolvency, or similar proceeding on the date this Agreement is executed by DIA and was not within the three years preceding such date, except as disclosed in the License Application.  The persons signing this Agreement on behalf of Licensee personally represent and warrant to DIA that they are authorized to execute this Agreement and any other agreement with DIA for and on behalf of Licensee and have full authority to so bind Licensee.

23.   **Miscellaneous.**

(a) (Notice)  Any notice required or desirable hereunder shall be sent in writing, by First Class United States Mail (effective upon posting) or other delivery means (effective upon receipt), including without limitation electronically through the Reservation System computer terminal equipment, to the following addresses (or as the parties may from time to time in writing designate):

To Licensee:

CINN192

22

JBS Inc., II
2104 North Ocean Boulevard
Myrtle Beach, South Carolina  29577
Attn: Jonathan Smith

To DIA:

Days Inns of America, Inc.
339 Jefferson Road
Parsipanny, NJ 07054
Attn:  Franchise Administration

Provided, however that any Section 17 notice of transfer, or any notice of default or License termination, shall be sent by certified mail or other means of receipted courier delivery, or by facsimile transmission with confirmation by certified mail, and shall be effective upon delivery, whether or not accepted by Licensee.

(b) (Relationship)   DIA and Licensee are not (by virtue of this Agreement alone) joint venturers, partners, agents of or for each other, and neither shall have the power to obligate the other.  The license relationship is not and will not be a fiduciary relationship.

(c) (Remedies and Waiver)   Failure, delay or forbearance of DIA to insist on strict performance of any of the terms and provisions of this Agreement, or to exercise any right or remedy, shall not be construed as a waiver.  Express waiver in one or more instances shall not waive subsequent strict performance. Remedies specified in this Agreement are cumulative and not exclusive of any remedies available at law or in equity.  Licensee acknowledges that DIA will suffer irreparable harm to the good will of the System and Marks, and will be entitled to injunctive relief to enjoin Licensee's violation of this Agreement. Licensee agrees to pay all costs and expenses, including attorneys' fees, incurred by DIA in enforcing any provision of this Agreement.

(d) (Construction)   This Agreement:   (i) including all addenda, schedules and exhibits, is the parties' entire agreement, superseding all prior oral and written agreements and understandings; (ii) shall be severable and the failure of any distinct part will not void the remainder; (iii) can be amended only in a writing signed by authorized representatives of both parties, except that DIA may circulate a revised Schedule C from time to time which shall not require signature by Licensee to be effective; (iv) shall be deemed executed in and shall be governed by the laws of the State of Georgia; (v) shall, except as otherwise herein provided, bind and inure to the benefit of the parties signatory, their successors and assigns; (vi) shall not be construed to create (other than in DIA) any third party beneficiary rights; and (vii) may be executed in any number of counterparts.  Section headings are for convenience only and shall not affect interpretation.  All references to specific statutes shall include all amendments thereof and successors thereto.  All references to the neuter gender shall also refer to the masculine and feminine genders, as the context requires or permits.

CINN192

23

(e) (Effects of Laws and Regulations)  If this Agreement is or becomes subject to any law or regulation: (i) which limits DIA's right to terminate the License, any inconsistent provisions of this Agreement shall be deemed stricken and DIA shall be deemed to have every termination right permitted under such law or regulation at the time DIA acts to terminate the License; (ii) which limits DIA's right to fail or refuse to renew the license at expiration of its Term, this Agreement shall be deemed amended to grant Licensee an option to obtain a new license agreement for a five year term in the form and for the fees then offered by DIA for conversions of non-System facilities, provided that Licensee satisfies DIA's requirements (which may include major renovations, upgrading and the like) for meeting System Standards for conversions; (iii) which prohibits liquidated damages provisions, such provisions shall be deemed stricken and the parties shall have the right to seek appropriate damages; (iv) which otherwise conflicts with any other provision of this Agreement, such provision shall be deemed amended to permit DIA to exercise rights of that type to the maximum extent permitted by such law or regulation, or if not permitted, the provision shall be deemed stricken.

(f) (Consent to Jurisdiction)  Licensee consents to and waives any and all objections to the non-exclusive personal jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York and further waives objection to venue in any such court, in and for all cases and controversies at law and in equity relating to or arising under this Agreement, related and ancillary agreements with DIA and their affiliates, and the relationship between Licensee and DIA.

(g) (Signage)  Notwithstanding anything contained in the License Agreement to the contrary, under no circumstances shall Licensee make use of any Marks in interior or exterior signage, use any Mark-bearing supplies or materials in guest rooms or public areas, or otherwise identify the Unit as a Days Inn System unit prior to the Commencement Date without the express prior written consent of DIA in each and every instance, or as permitted under and strictly in accordance with the System Standards.

Signatures on following page

CINN192

24

THE PARTIES HAVE EXECUTED THIS AGREEMENT AS OF THE ABOVE DATE:

LICENSEE:

JBS INC., II

By:_____
        (Vice) President

Attest:_____



DIA:

DAYS INNS OF AMERICA, INC.


By:_____
        Gregory D. Casserly
        Executive Vice President
        Franchising


Attest:_____
                Secretary

CINN192

25

## GUARANTEE AGREEMENT

As an inducement to Days Inns of America, Inc. ("DIA") to execute the preceding License Agreement, dated as of even date herewith, with JBS Inc., II, as Licensee, the undersigned (if more than one, jointly and severally) hereby agree to be bound by all terms of the License Agreement and any amendments thereof, and supplements thereto, including all addenda, schedules and exhibits now or hereafter existing, and irrevocably, unconditionally and personally guarantee to DIA, its affiliates, successors and assigns, that all of Licensee's obligations thereunder (including without limitation payment of all Initial Fees, Continuing Fees, rooms addition fees, transfer fees processing fees, attorneys' fees and costs of enforcement of DIA's remedies) and under any promissory note issued by Licensee to DIA or its order will be punctually paid and performed. The undersigned waive, to the extent permitted by applicable law, notice of acceptance, notice of default, presentment and demand. Upon default by Licensee and receipt of written notice from DIA, the undersigned will immediately make each payment and perform or cause to be performed each obligation of Licensee under the Agreement. DIA may to the extent permitted by applicable law (without affecting any obligation of any of the undersigned) waive any Licensee default, extend any Licensee cure period, or settle, adjust, compromise or release any indebtedness of or claims against Licensee. The undersigned waive notice of amendment of the License Agreement, and demand for payment or performance by Licensee. The undersigned further waive the defenses of novation, increase in risk, release or compounding of any other guarantor, or any requirement that DIA first exhaust other remedies, resort to any collateral, or proceed diligently to collect any amounts due from Licensee, this Guarantee Agreement being a primary obligation of the undersigned and a guarantee of payment and performance, not of collection. Upon death of an individual guarantor, the estate of such guarantor will be bound by this Guarantee Agreement with respect to any defaults existing at the time of death. If there is more than one guarantor, the obligations of the other undersigned guarantors will continue in full force and effect without change. The guarantor(s) shall be obligated to pay DIA's costs, including reasonable attorney's fees, incurred to enforce its rights and remedies against Licensee under the License Agreement or under this Guarantee Agreement. This Guarantee Agreement shall be governed by and construed under the laws of the State of New York. Each guarantor consents to the non-exclusive personal jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York and further waives objection to venue in any such court in and for all cases and controversies at law and in equity relating to and arising under this Guarantee Agreement.

Dated: _____, 19____

Signature Witnesses:                          Guarantors:

_____                     _____(SEAL)
                                              Jonathan Smith, Individually

_____                     _____(SEAL)
                                              John B. Singleton, Individually

_____                     _____(SEAL)
                                              Marci Singleton Smith, Individually

CINN192

26

SCHEDULE "A"

## The Location

1.    Legal Description (metes and bounds):

(See Exhibit "A")

2.    Owners (names, addresses and percentage equity interests; attach separate exhibit if necessary):

a.    Of Licensee:    JBS Inc., II
2104 North Ocean Boulevard
Myrtle Beach, South Carolina  29577

b.    Of fee simple title to the Location, if not Licensee:

c.    Describe relationship between owners identified in a and b above:

3.    Leases to Location (parties, terms, etc.), if any:

(attach copy)

CINN192

EXHIBIT "A"

Legal Description

CINN192

SCHEDULE "B"


Construction Obligation


(Subject to compliance with the Design Standards, which are incorporated herein by reference)

1.  A Construction Obligation is required by DIA.  Improvements must be made to the Unit to the extent necessary to achieve minimum Quality Assurance inspection test scores of 400 prior to commencing operation of the Unit under the System and 425 within nine (9) months after the Opening Date.  Licensee must commence renovation by or before 30 days after the date of this Agreement and pass a Quality Assurance inspection with a score of 400 or better, and be ready, willing and able to open the Unit under the System on or before 90 days after the date of this Agreement to satisfy the Construction Obligation.

2.  Construction shall be deemed "commenced" under Section 4 when the following begins (check one):

    a.   Begin Renovation      ( X )

    b.   Other (describe)      (    )


3.  Number of approved guest rooms:  79


4.  Parking facilities (number of spaces, description):  At least 79


5.  Approved food & beverage facilities (seating capacity, type): None


6.  Other approved facilities and services (meeting rooms, gift shop, auto fueling, etc.): None


7.  Additional work required to satisfy the Construction Obligation (the "Punch List"):  See Exhibit "B" attached


CINN192

29

SCHEDULE "C"
DAYS INNS OF AMERICA, INC.
RESERVATION SYSTEM FEES

Effective March 1, 1990, the fees charged for participating properties in the Days Inn Reservation System are calculated as set forth below:

I. Basic Charges.

A. For a property reporting annual Gross Room Revenues* of at least $500,000.00, the Basic Charge will be 2.3% of Gross Room Revenues.

B. For a property reporting annual Gross Room Revenues of less than $500,000.00, the Basic Charge will be 1.5% of Gross Room Revenues.

C. For a property reporting annual Gross Room Revenues of more than $9,000,000.00, the Basic Charge will be 2.3% of the first $9,000,000.00, and 1.5% of Gross Room Revenues over $9,000,000.00.

D. The minimum Basic Charge is $400.00 for any month after the first month of reservation service.

II. Airline Automation Charges. For reservations originated by a computerized central reservation system other than the Days Inn Reservation System, the charge is $3.50 per gross room reservation. There is no credit for cancellations or no-shows. A "gross reservation" is a communication requesting reservations for any number of nights created in one transaction. Daystop units may elect not to participate in the Airline Automation Program by giving Days Inns 30 days prior notice of such election.

III. Alternative Minimum Fee. If a property receives fewer than 150 gross reservations through the Reservation System in any calendar month, and the property has no more than the "Maximum Close-Out Days Allowed" for that month, then the property will pay the Alternative Minimum Fee for that month in lieu of Basic Charges. The Alternative Minimum Fee for the month is the greater of (i) $5.55 per gross reservation, or (ii) $400.00. The Maximum Close-Out Days Allowed for any month is five, and is measured by adding the number of close-out days of the property's "Primary Room Type" for the "Close-Out Measurement Period" beginning on the second day of the month preceding the relevant month and ending on the last day of the relevant month. A close-out will be registered whenever the Primary Room Type is closed out during the Close-Out Measurement

---

\* The revenue base under "Franchisee Agreements" issued before January 1, 1986 is the "Gross Volume of Lodging Business".

CINN192

30

months in which the property does not pay or qualify for the Alternati Minimum Fee.

## X. Miscellaneous.

A. Any property terminated will be responsible to pay Basic Charges at the rate in effect at the time of termination through the date of termination, plus Travel Agent Commissions in a lump sum for all departures scheduled after the termination date. Adjustments for cancellations and no-shows will be recognized and paid if written notice is filed with Days Inns within 7 days after the scheduled departure date. Verification from the travel agent or guest may be required. Any property that has reservation service suspended will be charged Airline Automation Charges, Travel Agent Commissions, the Monthly Network Charge, hardware maintenance and incidental satellite service fees during the period of suspension, and billed in accordance with DIA's procedures described in VII(A) above. Basic Charges will accrue when reservation service is resumed.

B. A property is not eligible for the Alternative Minimum Fee for the months in which it enters and departs the Days Inn System, or for months in which the property is authorized to close by Days Inns.

CINN192

The ~~monthl~~ Franchise Report will be u~~sed t~~c ~~co~~mpute and transmit these Charges. DIA will use reasonable efforts to contact each property that qualifies for the Alternative Minimum Fee in any month by means of a message transmitted on the Reservation System. A property that is so notified should report and pay the Minimum Fee stated in the notice. Any property that is not notified that it qualifies for the Alternative Minimum Fee should report and pay the Basic Charge at the applicable rate (1.5% or 2.3%). If a property qualifies for the Minimum Fee but is not timely notified, any overpayment will be credited toward payment of Reservation Fees for the following month and will be shown as a credit on the property's monthly statement.

VIII. _Initial Entry Charge_. All license agreements executed after December 31, 1988 (except transfers of existing Days Inn System properties and reinstatements of terminated license agreements) will require the licensee to pay an Initial Entry Charge for establishing Reservation System service. The Charge will be the lesser of $100.00 per guest room, or $10,000.00 for each property. The Charge will be payable in three equal installments; the first is due on execution of the license agreement, which payment DIA may, in its sole discretion, defer until the property is ready to be opened for sale or pre-sale on the Reservation System (the "Reservation Start Date") when payment will be due, the second is due on the first anniversary of the date of the license agreement or the Reservation Start Date, as applicable, and the third is due on the second anniversary of the license agreement date or the Reservation Start Date, as applicable. The licensee will sign a non-interest bearing promissory note for the second and third installments. The note will be accelerated in the event of default or termination under the license agreement, or if a transfer occurs. No reservation service will be initiated until the first installment of the initial Entry Charge is received by DIA.

IX. _Transition Rules_.

A. Any property that was open under the Days Inn System for all of 1989 and reported to DIA aggregate Gross Room Revenues in 1989 of less than $500,000.00, or any property that was open under the Days Inn System less than all of 1989, or closes for a part of the year with Days Inns' consent and reported to DIA average monthly Gross Room Revenues of less than $41,667.00 while open under the Days Inn System, or any property of 50 rooms or less may commence Basic Charge payments at the 1.5% rate. All other properties must commence Basic Charge Payments at the 2.3% rate.

B. After all twelve Monthly Franchise Reports are filed for a calendar year (beginning with the reports for 1989), DIA will refund to any property that paid at the 2.3% rate but had less than $500,000.00 Gross Room Revenue the difference between the Basic Charges paid and the amount that should have been paid at the 1.5% rate. If a property paid at the 1.5% rate and had Gross Room Revenues over $500,000.00, DIA will invoice the property for the difference between the

Basic Charges paid and the amount that should have been paid at the 2.3% rate. Such invoice is payable on receipt and will be past due 10 days after receipt. Property operators are encouraged to monitor Gross Room Revenues so that the Basic Charges are adjusted promptly when the $500,000.00 level is reached, with the 2.3% rate applicable thereafter to that year and the subsequent year. Prompt payment of the difference in Basic Charges for the period prior to the change in Basic Charge rates is appropriate. If it is necessary to adjust fees for a different Basic Charge rate, adjustments will be calculated only for

CINN192

Period. The Primary Room Type will normally be Standard (STD) for Days Inn, Days Hotel and Daystop units, Lodge (LDG) for Days Lodge units, and Suites (SUI) for Days Suites units.

IV. <u>Other Fees</u>. There will be no "FAST" fees or group booking fees. Reservation equipment hardware maintenance charges will be billed according to the hardware maintenance program, if any, then in effect.

V. <u>Travel Agent Commissions</u>. All properties will participate in the Travel Agent Commission program. Each property will be billed for 10% of Gross Room Revenues at the confirmed room rate attributable to each reservation originated by a travel agent. The commission will be billed in the month following the month of the scheduled departure of the reservation. To cancel a commission in the event of a no-show or cancellation, follow the procedures set forth in the FAST Reservation System <u>Management User's Manual</u> under "Travel Agency Adjustments". Adjustments must be entered not later than 7 days after the scheduled departure date of the reservation.

VI. <u>Satellite Communications System Charges</u>. There is no direct equipment charge or fee for FAST equipment. The "Monthly Network Charge" for FAST service is $105.00**, payable monthly with the Basic Charge. The FAST program, including fees and charges, is set out in a Satellite Communications Agreement and Addendum, which supplement the Franchise/License Agreement for each property. GTE Spacenet will provide the satellite transmission and FAST equipment maintenance services. Units at which no satellite communications equipment is installed will not pay any Monthly Network Charge.

VII. <u>Payment of Fees</u>.

    A. All Reservation Fees are computed and paid in U.S. dollars. Days Inns will bill for airline automation charges, travel agent commissions, hardware maintenance and incidental satellite service fees, if any, on a monthly basis. Invoices for these fees are due on receipt and past due on the tenth day of the month following the month in which the invoice is issued, or as set forth on the invoice.

    B. The Basic Charge and the Monthly Network Charge will be paid together with Monthly Royalties by the tenth day of the month following the month in which the Charges accrue.

** Price includes sales taxes and may vary in Alaska, Hawaii and Canada; price subject to change with notice if GTE prices change.

CINN192

# Exhibit B

## GUARANTY

To induce DAYS INNS OF AMERICA, INC., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement and notice of demand for payment or performance of Licensee.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty but only for defaults and obligations hereunder existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESS _Christine Muller_ By: _____
                                    Jonathan B. Smith

WITNESS _Nancy G Wamner_ By: _____
                                    Marci Singleton Smith

# Exhibit C



**DAYS INN**

Days Inns Worldwide, Inc.
1 Sylvan Way
Parsippany, New Jersey 07054-0278

Tel 1-866-582-9104
Fax (973) 496-5345

FRANCHISE ADMINISTRATION

April 6, 2005

**VIA OVERNIGHT COURIER**

1 ZZZ445×( 195970  4

Mr. Jonathan B. Smith
JBS Inc., II
c/o Days Inn
2104 N. Ocean Boulevard
Myrtle Beach, SC 29577

Re:    **ACKNOWLEDGEMENT OF EXPIRATION** of the License for Days® System Unit
#4730-13760-1 located in Myrtle Beach, SC (the "Facility")

Dear Mr. Smith:

Days Inns Worldwide, Inc. ("we" or "us") and JBS Inc., II. ("you" or your") entered into a License Agreement, dated January 5, 1993 (the "Agreement") for the Facility. As you know, the Agreement expired on January 5, 2003. We have allowed you to continue operating the Facility as a Days Inn since that time. However, we write to notify you that the Agreement will terminate on July 6, 2005 (the "Termination Date"). I would like to take this opportunity to thank you for your business.

The Agreement requires you to perform certain post-termination obligations. In addition to other obligations specified in the Agreement, by no later than fourteen days after the Termination Date, you must (a) remove all signage and other items bearing the Days Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Days facility; and (d) remove the Days Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines. You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified. You must immediately return to us all training documents, operating manuals and other proprietary material.

You are also responsible for payment of all fees under the Agreement through the date you complete the de-identification process. We estimate that, as of April 5, 2005, you owe us $71,555.85 in Recurring Fees. We have enclosed an itemized statement for your convenience. You must also honor any advance reservations, including group holdings, made for the Facility before the Termination Date at the rates and terms set when the reservations were made. You must also timely pay all travel agent commissions. Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to all of your guarantors.

Mr. Jonathan B. Smith
April 6, 2005
Page Two


If you have any questions, please contact Joe Maida, Manager of Settlements, at (866) 582-9104,
option 6.

Sincerely,

Kathy Cox
Senior Director
Franchise Administration

cc:    The National Bank of South Carolina (Lender)   7001 0360 0003 3357 4022
       Carolina First Bank (Lender)   1 Z Z 2445 X 0 1 7870 7134
       Marci Singleton Smith (Guarantor)
       Joseph R. Kane, Jr.
       Joe Maida

```
ITEMIZED STATEMENT                                          PAGE 1
FOR DAYS INN #4730-13760 - Myrtle Beach-on the Ocean, SC
AS OF 2005-04-05
```

| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE | |
|-------|--------------|-----------|------|-----------:|---|
| 5 | FC0279774-01 | 2004-05-31 | FINANCE CHARGE | 731.94 | |
| | | | | 731.94 | |
| 7 | IN1323238-01 | 2004-07-19 | PROCS CHG KELLIE LAW | 22.18 | |
| | IN1323238-01 | 2004-07-19 | PROCS CHG KELLIE LAW | 22.18 | |
| | IN1323238-01 | 2004-07-19 | PROCS CHG Kellie Law | 25.00 | |
| | IN1323238-01 | 2004-07-19 | PROCS CHG Kellie Law | -2.82 | |
| | IN1323238-01 | 2004-09-23 | PROCS CHG Kellie Law | -22.18 | |
| | IN1323238-01 | 2005-03-17 | PROCS CHG Kellie Law | -22.18 | |
| | IN1323238-02 | 2004-07-19 | PROCS CHG SYNTHIA JA | 25.00 | |
| | IN1323238-02 | 2004-07-19 | PROCS CHG SYNTHIA JA | 25.00 | |
| | IN1323238-02 | 2004-07-19 | PROCS CHG Synthia Ja | 25.00 | |
| | IN1323238-02 | 2004-09-23 | PROCS CHG Synthia Ja | -25.00 | |
| | IN1323238-02 | 2005-03-17 | PROCS CHG Synthia Ja | -25.00 | |
| | IN1323238-03 | 2004-07-19 | PROCS CHG ELLEN SALA | 25.00 | |
| | IN1323238-03 | 2004-07-19 | PROCS CHG ELLEN SALA | 25.00 | |
| | IN1323238-03 | 2004-07-19 | PROCS CHG Ellen Sala | 25.00 | |
| | IN1323238-03 | 2004-09-23 | PROCS CHG Ellen Sala | -25.00 | |
| | IN1323238-03 | 2005-03-17 | PROCS CHG Ellen Sala | -25.00 | |
| | IN1323238-04 | 2004-07-19 | PROCS CHG PATRICIA B | 25.00 | |
| | IN1323238-04 | 2004-07-19 | PROCS CHG PATRICIA B | 25.00 | |
| | IN1323238-04 | 2004-07-19 | PROCS CHG Patricia B | 25.00 | |
| | IN1323238-04 | 2004-09-23 | PROCS CHG Patricia B | -25.00 | |
| | IN1323238-04 | 2005-03-17 | PROCS CHG Patricia B | -25.00 | |
| | IN1323238-05 | 2004-07-19 | PROCS CHG PAMELA HOD | 25.00 | |
| | IN1323238-05 | 2004-07-19 | PROCS CHG PAMELA HOD | 25.00 | |
| | IN1323238-05 | 2004-07-19 | PROCS CHG Pamela Hod | 25.00 | |
| | IN1323238-05 | 2004-09-23 | PROCS CHG Pamela Hod | -25.00 | |
| | IN1323238-05 | 2005-03-17 | PROCS CHG Pamela Hod | -25.00 | |
| | IN1324284-01 | 2004-07-19 | JLY-HSS SOFTWARE MAI | 83.33 | |
| | IN1324284-01 | 2004-07-19 | JLY-HSS SOFTWR MAINT | 83.33 | |
| | IN1324284-01 | 2004-07-19 | JLY-HSS SOFTWR MAINT | 83.33 | |
| | IN1324284-01 | 2004-09-23 | JLY-HSS SOFTWR MAINT | -83.33 | |
| | IN1324284-01 | 2005-03-17 | JLY-HSS SOFTWR MAINT | -83.33 | |
| | IN1328866-01 | 2004-07-23 | JLY-PPU HARDWARE MAI | 41.10 | |
| | IN1328866-01 | 2004-07-23 | JLY-PPU HARDWARE MAI | 41.10 | |
| | IN1328866-01 | 2004-07-23 | JLY-PPU HARDWARE MAI | 41.10 | |
| | IN1328866-01 | 2004-09-23 | JLY-PPU HARDWARE MAI | -41.10 | |
| | IN1328866-01 | 2005-03-17 | JLY-PPU HARDWARE MAI | -41.10 | |
| | IN1329308-01 | 2004-07-26 | PROCS CHG JENNIFER | 25.00 | |
| | IN1329308-01 | 2004-07-26 | PROCS CHG JENNIFER W | 25.00 | |
| | IN1329308-01 | 2004-07-26 | PROCS CHG Jennifer W | 25.00 | |
| | IN1329308-01 | 2004-09-23 | PROCS CHG Jennifer W | -25.00 | |
| | IN1329308-01 | 2005-03-17 | PROCS CHG Jennifer W | -25.00 | |
| | IN1329308-02 | 2004-07-26 | PROCS CHG CARRIE LAS | 25.00 | |
| | IN1329308-02 | 2004-07-26 | PROCS CHG CARRIE LAS | 25.00 | |
| | IN1329308-02 | 2004-07-26 | PROCS CHG Carrie LaS | 25.00 | |
| | IN1329308-02 | 2004-09-23 | PROCS CHG Carrie LaS | -25.00 | |
| | IN1329308-02 | 2005-03-17 | PROCS CHG Carrie LaS | -25.00 | |

ITEMIZED STATEMENT
FOR DAYS INN #4730-13760 - Myrtle Beach-on the Ocean, SC
AS OF 2005-04-05

| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE | |
|-------|--------------|-----------|------|-----------:|---|
| 7 | IN1329308-03 | 2004-07-26 | PROCS CHG JEFF MOORE | 25.00 | |
| | IN1329308-03 | 2004-07-26 | PROCS CHG JEFF MOORE | 25.00 | |
| | IN1329308-03 | 2004-07-26 | PROCS CHG Jeff Moore | 25.00 | |
| | IN1329308-03 | 2004-09-23 | PROCS CHG Jeff Moore | -25.00 | |
| | IN1329308-03 | 2005-03-17 | PROCS CHG Jeff Moore | -25.00 | |
| | IN1329308-04 | 2004-07-26 | PROCS CHG PATRICIA S | 25.00 | |
| | IN1329308-04 | 2004-07-26 | PROCS CHG PATRICIA S | 25.00 | |
| | IN1329308-04 | 2004-07-26 | PROCS CHG Patricia S | 25.00 | |
| | IN1329308-04 | 2004-09-23 | PROCS CHG Patricia S | -25.00 | |
| | IN1329308-04 | 2005-03-17 | PROCS CHG Patricia S | -25.00 | |
| | IN1329308-05 | 2004-07-26 | PROCS CHG ASHLEY BLA | 25.00 | |
| | IN1329308-05 | 2004-07-26 | PROCS CHG ASHLEY BLA | 25.00 | |
| | IN1329308-05 | 2004-07-26 | PROCS CHG Ashley Bla | 25.00 | |
| | IN1329308-05 | 2004-09-23 | PROCS CHG Ashley Bla | -25.00 | |
| | IN1329308-05 | 2005-03-17 | PROCS CHG Ashley Bla | -25.00 | |
| | IN1333176-01 | 2004-07-27 | JLY-PPU INTER-NET CH | 19.95 | |
| | IN1333176-01 | 2004-07-27 | JLY-PPU INTER-NET CH | 19.95 | |
| | IN1333176-01 | 2004-07-27 | JLY-PPU INTER-NET CH | 19.95 | |
| | IN1333176-01 | 2004-09-23 | JLY-PPU INTER-NET CH | -19.95 | |
| | IN1333176-01 | 2005-03-17 | JLY-PPU INTER-NET CH | -19.95 | |
| | IN1336105-01 | 2004-07-28 | TRIPREWARDS 5% CHRGB | 575.09 | |
| | IN1336105-01 | 2004-07-28 | TRIPREWARDS 5%CHRGBK | 575.09 | |
| | IN1336105-01 | 2004-07-28 | TRIPREWARDS 5%CHRGBK | 575.09 | |
| | IN1336105-01 | 2004-09-23 | TRIPREWARDS 5%CHRGBK | -575.09 | |
| | IN1336105-01 | 2005-03-17 | TRIPREWARDS 5%CHRGBK | -575.09 | |
| | TA2981287-01 | 2004-07-29 | T/A COMMISSIONS | 438.86 | |
| | TA2981287-01 | 2004-07-29 | T/A COMMISSIONS | 3,967.15 | |
| | TA2981287-01 | 2004-07-29 | T/A COMMISSIONS | 3,967.15 | |
| | TA2981287-01 | 2004-09-23 | T/A COMMISSIONS | -3,967.15 | |
| | TA2981287-01 | 2005-03-17 | T/A COMMISSIONS | -438.86 | |
| | TA2981287-01 | 2005-03-31 | T/A COMMISSIONS | -3,528.29 | |
| | TP3981287-01 | 2004-07-29 | GDS & INTERNET BKGS | 563.50 | |
| | TP3981287-01 | 2004-07-29 | GDS & INTERNET BKGS | 563.50 | |
| | TP3981287-01 | 2004-07-29 | GDS & INTERNET BKGS | 563.50 | |
| | TP3981287-01 | 2004-09-23 | GDS & INTERNET BKGS | -563.50 | |
| | TP3981287-01 | 2005-03-17 | GDS & INTERNET BKGS | -563.50 | |
| | FC0284818-01 | 2004-07-31 | FINANCE CHARGE | 177.90 | |
| | FC0284818-01 | 2004-07-31 | FINANCE CHARGE | 177.90 | |
| | FC0284818-01 | 2004-09-23 | FINANCE CHARGE | -177.90 | |
| | MV0857424-02 | 2004-07-31 | MARKETING FEE | 3,096.75 | |
| | MV0857424-02 | 2004-07-31 | MARKETING FEE | 4,522.33 | |
| | MV0857424-02 | 2004-07-31 | MARKETING FEE | 4,522.33 | |
| | MV0857424-02 | 2004-09-23 | MARKETING FEE | -4,522.33 | |
| | MV0857424-02 | 2005-02-14 | MARKETING FEE | -1,425.58 | |
| | MV0857424-02 | 2005-03-17 | MARKETING FEE | -3,096.75 | |
| | MV0857424-03 | 2004-07-31 | RESERVATION FEE | 6,934.24 | |
| | MV0857424-03 | 2004-07-31 | RESERVATION FEES | 6,934.24 | |
| | MV0857424-03 | 2004-07-31 | RESERVATION FEE | 6,934.24 | |
| | MV0857424-03 | 2004-09-23 | RESERVATION FEE | -6,934.24 | |
| | MV0857424-03 | 2005-03-17 | RESERVATION FEE | -6,934.24 | |

PAGE 3

ITEMIZED STATEMENT
FOR DAYS INN #4730-13760 - Myrtle Beach-on the Ocean, SC
AS OF 2005-04-05

| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE |
|-------|--------------|-----------|------|-----------:|
| ----- | ------------ | --------- | -------------------- | ------------------ |
| | | | | ------------------ |
| | | | | 12,177.90 |
| | | | | |
| 8 | IN1348095-01 | 2004-08-16 | G/S Jennifer White | 30.00 |
| | IN1348095-02 | 2004-08-16 | TRANS CHG Jennifer W | 75.00 |
| | IN1348095-07 | 2004-08-16 | G/S Joan Surace | 45.00 |
| | IN1348095-07 | 2004-08-16 | TRANS CHG Beth Walke | 75.00 |
| | IN1348095-08 | 2004-08-16 | PROCS CHG Althea Tay | 25.00 |
| | IN1348095-09 | 2004-08-16 | PROCS CHG Suzanne De | 25.00 |
| | IN1348095-10 | 2004-08-16 | PROCS CHG Randy Cran | 25.00 |
| | IN1348095-10 | 2005-03-31 | PROCS CHG Randy Cran | -2.46 |
| | IN1348095-11 | 2004-08-16 | PROCS CHG Susan Brow | 25.00 |
| | IN1351468-01 | 2004-08-19 | AUG-HSS SOFTWR MAINT | 83.33 |
| | IN1354965-01 | 2004-08-23 | G/S Smith | -45.00 |
| | IN1354965-02 | 2004-08-23 | PROCS CHG Lori Sebul | 25.00 |
| | IN1354965-03 | 2004-08-23 | PROCS CHG Nilda Aske | 25.00 |
| | IN1354965-04 | 2004-08-23 | G/S Randy Crank | 45.00 |
| | IN1354965-05 | 2004-08-23 | TRANS CHG Randy Cran | 75.00 |
| | IN1354965-06 | 2004-08-23 | PROCS CHG Leroy Stew | 25.00 |
| | IN1354965-07 | 2004-08-23 | PROCS CHG Vickey All | 25.00 |
| | IN1354965-08 | 2004-08-23 | PROCS CHG Cheryl Wri | 25.00 |
| | IN1354965-09 | 2004-08-23 | PROCS CHG Debra Priv | 25.00 |
| | IN1356247-01 | 2004-08-23 | AUG-PPU HARDWARE MAI | 41.10 |
| | IN1359142-01 | 2004-08-26 | TRIPREWARDS 5%CHRGBK | 942.83 |
| | IN1359142-02 | 2004-08-26 | TRIPREWARDS FNS CRDT | -533.85 |
| | TA2987607-01 | 2004-08-26 | T/A COMMISSIONS | 1,739.59 |
| | TP3987607-01 | 2004-08-26 | GDS & INTERNET BKGS | 468.50 |
| | IN1366424-01 | 2004-08-27 | AUG-PPU INTER-NET CH | 19.95 |
| | IN1369111-01 | 2004-08-30 | G/S Lori Poole | 35.00 |
| | IN1369111-02 | 2004-08-30 | TRANS CHG Lori Poole | 75.00 |
| | IN1369111-03 | 2004-08-30 | G/S Katherine Baker | 55.00 |
| | IN1369111-04 | 2004-08-30 | TRANS CHG Katherine | 75.00 |
| | IN1369111-05 | 2004-08-30 | PROCS CHG Donna Blai | 25.00 |
| | IN1369111-06 | 2004-08-30 | PROCS CHG Angi Ander | 25.00 |
| | IN1369111-07 | 2004-08-30 | PROCS CHG Toni Hunt | 25.00 |
| | MV0857425-01 | 2004-08-31 | ROYALTY FEE | 10,080.88 |
| | MV0857425-02 | 2004-08-31 | MARKETING FEE | 3,024.27 |
| | MV0857425-03 | 2004-08-31 | RESERVATION FEE | 4,637.21 |
| | | | | ------------------ |
| | | | | 21,366.35 |
| | | | | |
| 9 | IN1373477-01 | 2004-09-09 | PROCS CHG Donna Trum | 25.00 |
| | IN1373477-02 | 2004-09-09 | PROCS CHG Derick Gra | 25.00 |
| | IN1374939-01 | 2004-09-16 | G/S James Jone | 75.00 |
| | IN1374939-02 | 2004-09-16 | TRANS CHG James Jone | 75.00 |
| | IN1374939-03 | 2004-09-16 | PROCS CHG Barbara Ca | 25.00 |
| | IN1374939-04 | 2004-09-16 | G/S Angi Anderson | 25.00 |
| | IN1374939-05 | 2004-09-16 | TRANS CHG Angi Ander | 75.00 |
| | IN1374939-06 | 2004-09-16 | PROCS CHG Rudy Avili | 25.00 |
| | IN1374939-07 | 2004-09-16 | PROCS CHG Margaret E | 25.00 |

ITEMIZED STATEMENT
FOR DAYS INN #4730-13760 - Myrtle Beach-on the Ocean, SC
AS OF 2005-04-05

| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE | |
|-------|-------------|-----------|------|-----------:|---|
| 9 | IN1378966-01 | 2004-09-23 | SEP-HSS SOFTWR MAINT | 83.33 | |
| | IN1386077-01 | 2004-09-30 | G/S Rudy Avilia | 50.00 | |
| | IN1386077-02 | 2004-09-30 | TRANS CHG Rudy Avili | 75.00 | |
| | IN1386077-03 | 2004-09-30 | PROCS CHG Raina Inch | 25.00 | |
| | IN1386077-04 | 2004-09-30 | PROCS CHG Brian Stev | 25.00 | |
| | IN1386077-05 | 2004-09-30 | PROCS CHG Nicole Ruf | 25.00 | |
| | IN1386077-06 | 2004-09-30 | PROCS CHG Anthony Wr | 25.00 | |
| | IN1386077-07 | 2004-09-30 | PROCS CHG John W. Fo | 25.00 | |
| | IN1386077-08 | 2004-09-30 | PROCS CHG Susan Rose | 25.00 | |
| | IN1386077-09 | 2004-09-30 | TRIPREWARDS 5%CHRGBK | 669.49 | |
| | IN1386077-10 | 2004-09-30 | SEP-PPU INTER-NET CH | 19.95 | |
| | IN1386077-11 | 2004-09-30 | SEP-PPU HARDWARE MAI | 82.20 | |
| | MV0869040-01 | 2004-09-30 | ROYALTY FEE | 7,168.46 | |
| | MV0869040-02 | 2004-09-30 | MARKETING FEE | 2,150.54 | |
| | MV0869040-03 | 2004-09-30 | RESERVATION FEE | 3,298.00 | |
| | TA2993910-01 | 2004-09-30 | T/A COMMISSIONS | 1,820.16 | |
| | TP3993910-01 | 2004-09-30 | GDS & INTERNET BKGS | 1,021.00 | |
| | | | | 16,963.13 | |
| 10 | IN1391862-01 | 2004-10-07 | PROCS CHG Karla Zueh | 25.00 | |
| | IN1391862-02 | 2004-10-07 | PROCS CHG Eun Jung J | 25.00 | |
| | IN1391862-04 | 2004-10-07 | PROCS CHG Diana Mack | 25.00 | |
| | IN1391862-05 | 2004-10-07 | PROCS CHG Daniel Dow | 25.00 | |
| | IN1391862-06 | 2004-10-07 | PROCS CHG Chris Hagu | 25.00 | |
| | IN1395846-01 | 2004-10-21 | G/S Cheryl Wright | 102.60 | |
| | IN1395846-02 | 2004-10-21 | TRANS CHG Cheryl Wri | 75.00 | |
| | IN1395846-03 | 2004-10-21 | G/S Brian Stevenson | 45.00 | |
| | IN1395846-04 | 2004-10-21 | TRANS CHG Brian Stev | 75.00 | |
| | IN1395846-05 | 2004-10-21 | PROCS CHG Susan Poll | 25.00 | |
| | IN1395846-06 | 2004-10-21 | PROCS CHG Barry Menk | 25.00 | |
| | IN1395846-07 | 2004-10-21 | PROCS CHG Karla Snod | 25.00 | |
| | IN1395846-08 | 2004-10-21 | OCT-HSS SOFTWARE MAI | 94.00 | |
| | IN1401413-01 | 2004-10-28 | PROCS CHG Leonard La | 25.00 | |
| | IN1401413-02 | 2004-10-28 | PROCS CHG Omar Alayo | 25.00 | |
| | IN1401413-03 | 2004-10-28 | TRIPREWARDS 5%CHRGBK | 478.82 | |
| | IN1401413-03 | 2004-10-28 | TRIPREWARDS 5%CHRGBK | -44.62 | |
| | IN1401413-03 | 2004-10-28 | TRIPREWARDS 5%CHRGBK | -50.00 | |
| | IN1401413-03 | 2004-10-28 | TRIPREWARDS 5%CHRGBK | -100.00 | |
| | IN1401413-04 | 2004-10-28 | TRIPREWARDS FNS CRDT | -106.86 | |
| | IN1401413-05 | 2004-10-28 | OCT-PPU INTER-NET CH | 19.95 | |
| | IN1401413-06 | 2004-10-28 | 2005 CONFERENCE | 799.00 | |
| | IN1401413-07 | 2004-10-28 | 2005 ALLIANCE FEES | 720.00 | |
| | TA2997439-01 | 2004-10-28 | T/A COMMISSIONS | 621.56 | |
| | TP3997439-01 | 2004-10-28 | GDS & INTERNET BKGS | 520.50 | |
| | FC0292619-01 | 2004-10-31 | FINANCE CHARGE | 744.89 | |
| | IN1404690-01 | 2004-10-31 | OCT-PPU HARDWARE MAI | 82.20 | |
| | IN1404690-02 | 2004-10-31 | SERV.BUCKS CHG 56913 | 25.00 | |
| | MV0880210-01 | 2004-10-31 | ROYALTY FEE | 3,977.35 | |
| | MV0880210-02 | 2004-10-31 | MARKETING FEE | 1,193.21 | |

ITEMIZED STATEMENT                                          PAGE 5
FOR DAYS INN #4730-13760 - Myrtle Beach-on the Ocean, SC
AS OF 2005-04-05

| MONTH | RELATION NBR | ITEM DATE | DESC | AMOUNT DUE | |
|-------|--------------|-----------|------|-----------:|---|
| ----- | ------------ | --------- | -------------------- | ------------------ | ---- |
| 10 | MV0880210-03 | 2004-10-31 | RESERVATION FEE | 1,829.59 | |
| | | | | ------------------ | |
| | | | | 11,352.19 | |
| | | | | | |
| 3 | CK1850-01 | 2005-03-17 | CASH CORRECTION | -12,000.00 | |
| | IN1478128-01 | 2005-03-24 | MAR-HSS SOFTWARE MAI | 94.00 | |
| | 47300503A-01 | 2005-03-31 | ROYALTY ACCRUAL | 4,100.00 | ACR |
| | 47300503A-03 | 2005-03-31 | MKTG FEE ACCRUAL B | 1,200.00 | ACR |
| | 47300503A-06 | 2005-03-31 | RESERVATION FEE ACCR | 1,900.00 | ACR |
| | FC0308807-01 | 2005-03-31 | FINANCE CHARGE | 808.81 | |
| | IN1484721-01 | 2005-03-31 | TRIPREWARDS 5%CHRGBK | 245.75 | |
| | IN1484721-02 | 2005-03-31 | MAR-PPU INTER-NET CH | 19.95 | |
| | IN1488364-01 | 2005-03-31 | STOP PAYMENT | 12,000.00 | |
| | TA3030684-01 | 2005-03-31 | T/A COMMISSIONS | 402.33 | |
| | TP4030684-01 | 2005-03-31 | GDS & INTERNET BKGS | 193.50 | |
| | | | | ------------------ | |
| | | | | 8,964.34 | |
| | | | | ================== | |
| | | | | 71,555.85 | |

# Exhibit D



Days Inns Worldwide, Inc.
1 Sylvan Way
Parsippany, New Jersey 07054

Tel (973) 428-9700
Fax (973) 496-5915

March 20, 2006

*VIA OVERNIGHT MAIL*

Mr. Jonathan B. Smith
c/o JBS, Inc. II
2103 N. Ocean Blvd.
Myrtle Beach. SC 29577

**Re:     Service Mark Infringement**
**Former Days® Unit 4730-13760-1 ("Facility")**
**Located in Myrtle Beach, SC**

Dear Mr. Smith:

I am in-house counsel for Days Inns Worldwide, Inc. ("DIW"). I am writing with respect to the License Agreement dated January 5, 1993 between JBS, Inc. II ("JBS") and DIW for the operation of the Facility as a Days® guest lodging facility. As you are aware, the License Agreement was terminated on July 6, 2005, terminating the right to use the Days trade names and service marks (the "Marks") at the Facility. However, we have been informed that the Facility has not de-identified from its former appearance as a Days guest lodging facility.

JBS's continued use of the Marks and federally-registered logo in this manner is causing confusion among consumers as to the continued affiliation of the Facility with the Days System and is damaging relations between Days and its licensees. Accordingly, JBS's continued use of the Marks constitutes willful trademark infringement, unfair competition, and dilution in violation of the United States Trademark Act, 15 U.S.C. Section 1051, et seq. (the "Lanham Act") and state and common law. In addition, JBS's continued use of the Marks is a breach of the obligations under the License Agreement.

On behalf of DIW, I further write to demand that JBS immediately cease operating the Facility as a Days System Unit and distinguish it in all respects from its former appearance as a Days guest lodging facility. Specifically, DIW demands that JBS immediately discontinue all use of trade names, service marks, domain names, e-mail addresses, signs, forms of advertising and other indicia that the Facility operates as a Days

Mr. Jonathan B. Smith
March 20, 2006
Page Two

System Unit. JBS must also return to DIW all documents, instructions, operating manuals, guest comment cards, stationery, matchbooks, do not disturb cards, ashtrays and other items, which bear the Days name and registered logo. All billboard signs, interior signs, exterior signs (whether located on or off the premises), entrance signs, listings in telephone directories, the internet, travel guides, hotel indices, or similar guides in which the Facility is identified as a Days guest lodging facility must be changed. We will be sending a representative to the Facility shortly to ensure that S&P is in compliance with our demand.

Furthermore, our records reflect that JBS has also failed to satisfy its financial obligations to DIW. Outstanding recurring fees, which now total $63,147.06 remains due and owing. Demand is hereby made that all sums, including royalties fees due, be paid in full, and full de-identification of the Facility be accomplished no later than **March 30, 2006**.

DIW trusts that JBS appreciates the seriousness of this matter and will cooperate with the de-identification of the Facility and comply with the above demands. However, if de-identification is not complete, and JBS's account is not current by **March 30, 2006**, DIW will have no choice but to initiate litigation to compel the removal of all items bearing the Days Marks and to recover appropriate damages under the Lanham Act and other applicable laws, which may include the recovery of treble damages and attorneys' fees.

Very truly yours,

Marc D. Merriweather
Senior Counsel

MDM/am
202147